IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JASON GORDON,

                        Plaintiff,

      v.

MICHAEL PASQUARELLO, et al.,

                  Defendants.

CIVIL ACTION
NO. 22-1565

## OPINION

**Slomsky, J.**                                                   **March 14, 2023**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................................................... 1

II.  **BACKGROUND** .................................................................................................... 2

   **A.**   **Parties** ............................................................................................................ 2

      1.   Plaintiff ...................................................................................................... 2

      2.   Defendants ................................................................................................. 3

           a. Defendant Pasquarellos. .......................................................................... 3

           b. Defendant 1310-12 Frankford Ave, LLC. ................................................. 4

           c. Defendant HRCP ...................................................................................... 5

      3.   Other Entities ............................................................................................ 6

           a. 501 N. 13th Partners, LLC. ..................................................................... 6

           b. 428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC. ...................... 7

           c. Café Lift Narberth, LLC. .......................................................................... 7

   **B.**   **Facts** ............................................................................................................. 8

i

1.   Introduction ................................................................................................. 8

2.   501 N. 13th Partners, LLC ........................................................................ 11

3.   428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC ........................ 11

4.   Defendant 1310-12 Frankford Ave, LLC ................................................. 17

5.   Café Lift Narberth .................................................................................... 23

C.   **Procedural History** ...................................................................................... 27

III.  **STANDARDS OF REVIEW** .............................................................................. 28

A.   **Motion to Dismiss Standard under Federal Rule of Civil Procedure 12(b)(6) - Failure to State a Claim** ................................................................ 28

B.   **Motion to Dismiss Standard under Federal Rule of Civil Procedure 12(b)(1) - Lack of Subject Matter Jurisdiction** ........................................... 29

IV.  **ANALYSIS** ....................................................................................................... 30

A.   **Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim** .................................................................... 30

1.   Introduction and Elements of RICO ........................................................ 30

a.   Person ..................................................................................................... 31

b.   Enterprise ................................................................................................ 31

c.   Pattern of Racketeering Activity .............................................................. 32

i.   Racketeering Activity ........................................................................ 32

ii.  Pattern ............................................................................................... 33

2.   Plaintiff's RICO-Element Allegations ..................................................... 34

a.   Plaintiff Has Not Alleged a RICO Enterprise in Count I ......................... 34

i.   The Enterprise as Described in the Complaint .................................. 34

ii.  The Enterprise as Described in the RICO Case Statement ................ 37

b.  Plaintiff Has Not Alleged a Pattern of Racketeering Activity ................................. 43

i.  Legal Principles ................................................. 46

1.  Integration Clause ................................................. 46

2.  Gist of the Action Doctrine ................................................. 48

ii.  428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC ............................. 52

iii.  Defendant 1310-12 Frankford Ave, LLC ........................................ 54

iv.  Café Lift Narberth ................................................. 59

3.  Standing Under RICO ................................................. 62

a.  Injury to Business or Property ................................................. 63

b.  Proximate Cause ................................................. 63

4.  Plaintiff Has Not Pled Proximate Cause ................................................. 64

**B.  Motion to Dismiss Certain Counts under Federal Rule of Civil Procedure 12(b)(1) for Lack of Subject Matter Jurisdiction** ........................................ 65

**V.  CONCLUSION** ................................................. 69

## I.    INTRODUCTION

In 1970, Congress enacted the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.  This Act is commonly referred to as the RICO statute.  In enacting this statute, Congress's intent was to give federal law enforcement new tools to combat organized crime.  But as part of the statute, Congress also created civil remedies for persons injured in their business or property by a violation of prohibited activities described in RICO.  These persons can sue in a United States District Court for money damages and other relief.  For a person initially to sustain a claim under RICO, specific elements of this claim must be alleged in the Complaint and related documents.  When a Motion to Dismiss is filed by a defendant under Federal Rule of Civil Procedure 12(b)(6) alleging that the Complaint fails to state a RICO claim, a court views the allegations in the Complaint and related documents[1] in the light most favorable to a plaintiff to determine if the elements of RICO are sufficiently alleged.

Here, Plaintiff Jason Gordon sued Defendants Michael and Jeniphur Pasquarello (the "Pasquarellos") and their related organizations for a violation of the RICO statute.  Unfortunately for Plaintiff, his allegations do not meet the elements of the asserted RICO claim.  Accordingly, his RICO claim will be dismissed.  And although Plaintiff also has alleged claims under state law along with the RICO claim, because the RICO claim is the only basis for federal jurisdiction and there is no diversity of citizenship between the parties to support federal jurisdiction over the state law claims, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law

---

[1]    Plaintiff was ordered in this case to file what is known as "a RICO Case Statement."  A RICO Case Statement seeks facts that a plaintiff relies upon to establish the elements of a RICO claim.

claims.  Consequently, Defendants' Motion to Dismiss the Complaint will be granted in its entirety.

This case was brought to recover damages stemming from real estate and restaurant ventures that went awry.  Plaintiff Jason Gordon and Defendants Michael and Jeniphur Pasquarello pursued real estate investment opportunities by forming limited liability companies and entering into several agreements.  Defendants 1310-12 Frankford Avenue, LLC ("1310-12 Frankford Ave, LLC") and HRCP Restaurants, Inc. ("HRCP") are two entities that participated in one of the real estate ventures.  They are owned and controlled by the Pasquarellos.  The Pasquarellos and these entities collectively will be referred to as "Defendants."[2]  In his Complaint, Plaintiff alleges claims against Defendants under the RICO statute and Pennsylvania common and statutory law.  (Doc. No. 2.)

## II.    BACKGROUND

### A.  Parties

#### 1.  Plaintiff

Plaintiff Jason Gordon is an entrepreneur who invests in and "operates food, real estate and consulting businesses in the Philadelphia area."  (Id. ¶ 7.)  He is a resident of Pennsylvania.  (Doc. No. 20 at ¶¶ 1, 4(b).)

---

[2]    In his RICO Case Statement, Plaintiff names Prohibition Taproom, LLC, and Café Lift, Inc. also as Defendants.  (Doc. No. 20 ¶ 1.)  These entities are not listed in the caption of the Complaint nor are they named as Defendants in any Counts in the Complaint.

2.  Defendants

a.  Defendant Pasquarellos[3]

Defendants Michael and Jeniphur Pasquarello are restauranteurs.  (Id. ¶¶ 8-9, 15.)  They "own, operate or manage" five restaurants "through a restaurant collective" they jointly own known as 13th Street Kitchens.[4]  (Id. ¶¶ 2, 9.)  The restaurants are: (1) Café Lift; (2) Prohibition Taproom; (3) Kensington Quarters; (4) KQ Burger; and (5) LaChinesca.[5]  (Id. ¶ 2.)  Michael Pasquarello "owns and controls each defendant entity, either individually or with his wife."  (Id. ¶ 8.)  The Pasquarellos are residents of New Jersey.  (Doc. No. 20 at ¶¶ 1, 4(b).)  Their ownership of the restaurants can be charted as follows:



---

[3]  Plaintiff alleges in the Complaint that "[t]he claims all arise from the actions of defendant Michael Pasquarello and his wife, Jenniphur [sic] Pasquarello . . ."  (Doc. No. 2 ¶ 2.)  However, while Jeniphur Pasquarello is named as a defendant, her role in this case appears to be minimal.  More specifically, while she is alleged to have made oral misrepresentations, she was not a party to, nor did she sign, the Limited Liability Corporation ("LLC") Agreements for any of the ventures.  Rather, Jeniphur's involvement seems to stem solely from her joint ownership of the 13th Street Kitchen collective and the five restaurants included within that collective, as well as her managerial role in a restaurant named Café Lift located in Narberth, Pennsylvania.  (See id. ¶ 62.)  This restaurant will be referred to as Café Lift Narberth.

[4]  It appears that these restaurants have fictious names, although owned by 13th Street Kitchens, which is a separate company.  (See Doc. No. 7-3 at 3.)

[5]  The RICO Case Statement names another Pasquarello restaurant, Café Lift Haddonfield, as a member of this collective.  (See Doc. No. 20 ¶ 4(e).)

b.  <u>Defendant 1310-12 Frankford Ave, LLC</u>

Defendant 1310-12 Frankford Ave, LLC "is a Pennsylvania limited liability company controlled by the Pasquarellos."[6]  (<u>Id.</u> ¶ 10.)  It owns 1310-12 Frankford Avenue in Philadelphia, where the restaurant Kensington Quarters leased space.  (<u>Id.</u> ¶ 38; Doc. No. 2-5 at 1.)  1310-12 Frankford Ave, LLC initially had two members: Michael Pasquarello and Robert Mackey.  (Doc. No. 7-6 at 1.)  Upon Mackey's passing, his estate assumed his membership.  (<u>See</u> Doc. No. 2 ¶¶ 38, 39.)  The estate "owned all of the Class A Shares - and had guaranteed a mortgage" on 1310-12 Frankford Avenue.  (<u>Id.</u> ¶ 39.)  Michael Pasquarello owned the Class B shares, which were the only voting shares, giving him control over the property.  (<u>Id.</u> ¶¶ 39, 41.)  He also served as the Manager of 1310-12 Frankford Ave, LLC.  (<u>Id.</u> ¶ 41.)  In the real estate venture between Plaintiff Jason Gordon and Pasquarello, Plaintiff "purchased the Class A units for $100,000, and personally guaranteed the . . . mortgage . . . ."  (<u>Id.</u> ¶ 48.)  1310-12 Frankford Ave, LLC and its ownership[7] can be charted as follows:

---

[6]  Jeniphur Pasquarello was not a member of 1310-12 Frankford Ave, LLC and did not have total control of this LLC.  Michael Pasquarello was a member of 1310-12 Frankford Ave, LLC and had "sole control of the 1310-12 Frankford property."  (Doc. No. 2 ¶ 41.)  Plaintiff initially alleges in the Complaint that this control was exercised "on behalf of him and his wife" (<u>id.</u>), but later states that Michael "solely and completely controlled the business operations of 1310-12 Frankford [Ave, LLC] . . . ."  (<u>Id.</u> ¶ 56.)  Later, in the RICO Case Statement, Plaintiff changes course and states that Jeniphur had a role in controlling 1310-12 Frankford Ave, LLC.  (<u>See</u> Doc. No. 20 ¶ 1.)  However, Michael was the only manager of 1310-12 Frankford Ave, LLC.  (Doc. No. 2 ¶ 41.)

[7]  Plaintiff does not state the ownership structure in percentages, so it is unclear whether they owned the company equally.



c.    Defendant HRCP

Defendant HRCP "is a Pennsylvania corporation owned and controlled by the Pasquarellos."[8]  (Doc. No. 2 ¶ 11.)  Its principal place of business is located at 1310-12 Frankford Avenue, Philadelphia, Pennsylvania.  (Doc. No. 7-2 at 1.)  HRCP owned Kensington Quarters and paid rent to 1310-12 Frankford Ave, LLC.  (Doc. Nos. 2 ¶¶ 38, 43-44; 20 ¶ 1.)  This relationship is described in the following chart:

---

[8]    In an attachment to the Motion to Dismiss, Michael Pasquarello submitted a personal statement titled "Declaration of Michael Pasquarello in Support of Motion to Dismiss."  He states in the Declaration that he is the "sole owner" of HRCP.  (Doc. No. 7-2 at 1.)



### 3. Other Entities

As Plaintiff invested in the real estate ventures brought to him by the Pasquarellos, new entities were formed.  To understand the allegations here, it is necessary to describe the additional entities.  These entities are associated with properties located at (1) 501 N. 13th Street; (2) 428 and 429 N. 13th Street; and (3) Café Lift Narberth[9] and will be discussed in turn.

#### a. 501 N. 13th Partners, LLC

The first new entity is 501 N. 13th Partners, LLC.  It was created to purchase 501 N. 13th Street.  (Doc. No. 2 ¶¶ 22-23.)  Plaintiff owned 75% of this LLC and Michael Pasquarello owned 25%.  (See id. ¶ 24; Doc. No. 2-4 at 26.)  This arrangement is charted as follows:



---

[9]  For Café Lift Narberth, the venture related to the restaurant directly.  It was not a real estate venture.

b.  <u>428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC</u>

The second real estate venture between Pasquarello and Plaintiff concerned seven units in two properties located at 428 and 429 N. 13th Street.  (Doc. No. 2 ¶¶ 26-27.)  To acquire these properties, Plaintiff created two new entities: (1) 428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC.  (<u>Id.</u> ¶ 29.)  Plaintiff and Pasquarello held 50% ownership in each entity (<u>id.</u>), which is charted below.



c.  <u>Café Lift Narberth, LLC</u>

A third venture involved the creation of the restaurant Café Lift Narberth.  (<u>Id.</u> ¶ 60.)  It was owned by Café Lift Narberth, LLC ("CLN").  (<u>Id.</u>)  Pasquarello owned 30% of CLN and Plaintiff owned 70%.  (<u>Id.</u> ¶ 61.)  Plaintiff "was the manager of CLN."  (<u>Id.</u>)  The Pasquarellos were the managers of the restaurant Café Lift Narberth.  (<u>Id.</u> ¶ 62.)  The CLN chart is set forth below:



B. **Facts**[10]

1. Introduction

Michael Pasquarello and Plaintiff Jason Gordon met in 2016. (Id. ¶ 15.) Plaintiff was informed that Pasquarello was a "successful restauranteur" and "had access to real estate opportunities." (Id.) But given their financial status, the Pasquarellos sought outside funding and turned to Plaintiff. (Id. ¶ 17.) In 2017, Michael Pasquarello spoke with Plaintiff "about investing in properties in Philadelphia at below market prices, including those properties where the Pasquarellos were operating restaurants and had existing leases." (Id. ¶ 16.) In addition, he asked Plaintiff about "jointly operating and/or owning new restaurants." (Id.) Michael Pasquarello informed Plaintiff that: (1) he could locate "properties for sale at below market prices"; (2) his restaurants' current leases would "increase[] the value of . . . the properties" presented to Plaintiff; (3) the proposed properties "could be purchased under the prevailing market values," enabling them to be sold or refinanced quickly and at a profit; (4) Michael Pasquarello was experienced in the Philadelphia market; and (5) because the Pasquarellos' restaurants occupied the proposed properties and paid rent to them, Plaintiff's debt would be partially alleviated and the properties would become more valuable for an eventual sale or refinance. (Id. ¶ 17.)

---

[10] The facts are taken from the Complaint, documents referred to in the Complaint that are integral to the facts alleged in it, and the RICO Case Statement. Typically, when a district court is faced with a Motion to Dismiss, it "may not consider matters extraneous to the pleadings. However[,] an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." Walker v. Kemp, 587 F. Supp. 3d 232, 239 (E.D. Pa. 2022) (emphasis in original) (internal quotation marks and citations omitted). Further, when a plaintiff asserts a RICO violation, and the court is ruling on a Motion to Dismiss, a RICO Case Statement is generally considered in conjunction with the Complaint. See Schwartz v. Laws. Title Ins. Co., 680 F. Supp. 2d 690, 704 (E.D. Pa. 2010) (citation omitted); Gintowt v. TL Ventures, 226 F. Supp. 2d 672, 679-80 (E.D. Pa. 2002) (citations omitted). The facts alleged in these documents are accepted as true at the Motion to Dismiss stage.

In addition, in exchange for the financing, Michael Pasquarello promised Plaintiff that he would "receive from the first monies realized from the sales of each property, (a) all of the money he invested in each property; plus (b) interest at 8% per annum, compounded, on the money he invested in the property." (Id. ¶ 18.)  Further, any excess profits resulting from the sales were to be distributed according to their ownership interest and Michael Pasquarello "promised to pay his share of the expenses incurred in owning the properties, including improvements, condo fees, taxes, maintenance and upkeep." (Id.)

Plaintiff alleges that the same representations were made before he entered into the following ventures: (1) 501 N. 13th Partners, LLC; (2) 428 and 429 N. 13th Partners, LLC; and (3) 1310-12 Frankford Ave, LLC.  (See id. ¶¶ 20, 33, 45.)  By contrast, the representations preceding the Café Lift Narberth venture included the Pasquarellos' promises to "(a) repay the Opening Expenses; (b) pay the rent, utilities and other expenses under the triple net lease[11] then in effect; and (c) cover their management fees." (Id. ¶ 65.)

Michael Pasquarello made these promises to Plaintiff "in person and over the phone on behalf of himself and Jenniphur [sic] Pasquarello beginning in early 2017 and continuing through 2020 . . . ." (Id. ¶ 20.)  In the RICO Case Statement, Plaintiff alleges that some of these calls were interstate because Plaintiff lives in Pennsylvania and the Pasquarellos live in New Jersey.  (Doc. No. 20 at ¶¶ 1, 4(b)-(c), 9.)  Although Plaintiff alleges that the Pasquarellos' representations and promises were untruthful and that Plaintiff "reasonably relied on them as true and correct," inducing him to invest in the ventures (Doc. No. 2 ¶¶ 20-21), written agreements were created by

---

[11]  A triple net lease is "normally a commercial lease where the lessee pays rent and utilities as well as three other types of property expenses: insurance, maintenance, and taxes." See Triple Net Lease, LEGAL INFORMATION INSTITUTE (Mar. 7, 2023, 3:04 PM), https://www.law.cornell.edu/wex/triple_net_lease#:~:text=Triple%20net%20lease%20(NNN)%20is,insurance%2C%20maintenance%2C%20and%20taxes.

the parties contemporaneously with the transactions.[12]  (See Doc. Nos. 2-4, 7-4, 7-5, 7-6.)  Before the written agreements were executed, however, the Pasquarellos' inducements to Gordon were made orally.  (See Doc. No. 2 ¶¶ 20, 33, 45.)

As described above, Plaintiff and Defendants participated in four ventures involving the following: (1) 501 N. 13th Partners, LLC; (2) 428 and 429 N. 13th Partners, LLC; (3) 1310-12 Frankford Ave, LLC; and (4) Café Lift Narberth.  Each venture will be described in turn.

---

[12]  It is unclear whether a written agreement was executed for Café Lift Narberth, LLC, as neither party has submitted such an agreement.  The parties' representations, however, indicate that there was a written agreement.  Defendants argue in their Motion to Dismiss the Complaint that Plaintiff is in possession of either a written operating agreement or a lease, but that he has refused to provide Defendants with a copy.  (Doc. No. 7-3 at 5.)  In Count VII of the Complaint, Plaintiff asserts a claim for "breach of the management agreement."  (Doc. No. 2 ¶¶ 112-16.)  Plaintiff also states that "the parties entered into an agreement for the defendants to operate Café Lift Narberth."  (Id. ¶ 113.)  In his Response to the Motion to Dismiss the Complaint, Plaintiff references an "operating agreement of the LLC that owned Café Lift Narberth" and argues that he "pleads a claim for breach of the Café Lift Narberth's owner's operating agreement against only Michael," while also stating that he pleads a claim "concerning her [Jeniphur's] breach of her the [sic] oral management contract."  (Doc. No. 11 at 10.)

Further, he states that "only the three parties – not the LLC – were party to the oral management agreement as the oral contract predated the formation of the LLC and was made to induce Jason Gordon's investment of which the LLC formation was an incident."  (Id. at 16.)  Finally, in the Supplemental Response to the Motion to Dismiss, Plaintiff writes "[h]ere, the operating agreements of … and Café Lift Narberth, LLC have nothing to do with Jason Gordon's claims that the defendants induced him to invest capital or to undertake debt based on fraudulent oral representations."  (Doc. No. 23 at 2.)

Therefore, it appears that there were two agreements: (1) an operating agreement for CLN and (2) an oral management agreement.  However, at the hearing on the Motion to Dismiss, defense counsel stated: "[t]here is no written agreement for Café Lift Narberth."  Oral Argument at 16:31-16:35.  Later in the hearing, Plaintiff's counsel confirmed this and said: "[t]here wasn't any written LLC agreement . . . ."  Id. at 47:22.  He then continued: "between the parties, the oral understanding was the same as in all of the other cases.  That they [Defendants] would come in, they would manage, that special skills, they would manage Café Lift and they would get a portion of the ownership of the property in return for doing that."  Id. at 47:23-47:45.

2. <u>501 N. 13th Partners, LLC</u>

The first venture between the parties began in late 2016.  (<u>Id.</u> ¶ 22.)  Michael Pasquarello proposed that Plaintiff purchase 501 N. 13th Street, in which the restaurant named Prohibition Taproom is located.  (<u>Id.</u>)  Prohibition Taproom leased premises at the property.  (<u>Id.</u>)  This property also had three other units "rented to third parties."  (<u>Id.</u> ¶ 23.)  To acquire this property, Plaintiff created 501 N. 13th Partners LLC[13] "to take title to the property."  (<u>Id.</u>)  The Limited Liability Company Agreement establishing 501 N. 13th Partners, LLC[14] was executed on March 29, 2017 between Plaintiff and Michael Pasquarello.  (<u>See</u> Doc. No. 2-4 at 1, 25-26.)  Because Pasquarello introduced Plaintiff to this opportunity, Plaintiff granted him a 25% ownership interest in the LLC.  (<u>See id.</u> at 26; Doc. No. 2 ¶ 24.)  The property was purchased on April 26, 2017.[15] (Doc. No. 2 ¶ 23.)  Plaintiff refinanced this property in November 2017 "on very favorable terms." (<u>Id.</u> ¶ 25.)  Plaintiff concedes that this transaction "seemed to confirm the truth of Michael Pasquarello's representations that he had peculiar knowledge of the real estate market in the area." (<u>Id.</u>)

3. <u>428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC</u>

Next, Michael Pasquarello presented 428 and 429 N. 13th Street to Plaintiff as a second investment opportunity after repeating, according to Plaintiff, the same representations described above in person and over the phone.  (<u>Id.</u> ¶¶ 26-27, 33-34.)  Café Lift, a Pasquarello restaurant, and 13th Street Kitchens were tenants in two units in 428 N. 13th Street.  (<u>Id.</u> ¶¶ 26, 28.)  This

---

[13]   Plaintiff does not allege that he suffered any damages from this transaction.  (<u>See</u> Doc. Nos. 2 at ¶ 25; 20 at ¶ 4(d)-(e).)  Accordingly, the terms of the LLC Agreement need not be reproduced or analyzed here.

[14]   This Agreement is attached to Plaintiff's Complaint as Exhibit A.  (Doc. No. 2-4.)

[15]   The purchase price of this property is not revealed.

property consisted of three units and a parking garage.  (Id. ¶ 27.)  Two of the units were for

commercial occupants; Café Lift occupied one and a third-party occupied the other.  (Id. ¶ 28.)

The third unit was for non-commercial use and 13th Street Kitchens had its offices there.[16]  (Id.)

429 N. 13th Street consisted of four residential units.  (Id. ¶¶ 27-28.)

Plaintiff and Pasquarello discussed purchasing the seven units in 2017.  (Id. ¶ 29.)  To assist

with their purchase, Plaintiff created two entities to take title to the two properties: (1) 428 N. 13th

Partners, LLC and (2) 429 N. 13th Partners, LLC (collectively, the "LLCs").  (Id.)  Plaintiff and

Michael Pasquarello own 50% of each LLC and Plaintiff is the Managing Member of both.  (Id.;

see Doc. Nos. 7-4, 7-5 at 11, 25.)

Before the acquisition took place, one of the units in 428 N. 13th Street, 428 H became

available to purchase.  (Doc. No. 2 ¶ 30.)  Fearing that a third party would buy it, Michael

Pasquarello "convinced Gordon to purchase it in the name of 428 N. 13th [Partners, LLC] . . . [and]

to put up all the money in the all-cash transaction . . . ."[17]  (Id.)  The unit was purchased in

December 2017.[18]  (Id. ¶ 31.)  Plaintiff alleges that while Michael Pasquarello did not financially

---

[16]   In the Complaint, Plaintiff states:

> Two of the three units were commercial units and the third, non-commercial unit
> was leased to 13th Street Kitchens (the collective owned by the Pasquarellos) for
> use as its offices.  Café Lift occupies one of the commercial units and a third-party
> occupied the other commercial unit [and] its lease ended in September 2021.
> Michael Pasquarello leases the other commercial unit as his office.

(Doc. No. 2 ¶ 28.)

These allegations refer to four units in 428 N. 13th Street, rather than three.  It is unclear whether
Michael Pasquarello's office is located in the same unit as the 13th Street Kitchens office.

[17]   Neither the Complaint nor any of the filings attach a record of this purchase or its details.

[18]   It appears that Plaintiff purchased this property without financial assistance from an outside
source.  (See Doc. No. 11 at 3.)

contribute to the purchase of unit 428 2H, he still held 50% ownership in 428 N. 13th Partners, LLC.  (See id. ¶ 30.)

Plaintiff and Pasquarello executed the Limited Liability Company Agreement for 428 N. 13th Partners, LLC on May 24, 2018, and executed the Limited Liability Company Agreement for 429 N. 13th Partners, LLC[19] on the same day.  (Doc. Nos. 7-4, 7-5 at 1, 24.)

The terms of the LLC Agreements are important.  The relevant provisions are reproduced below.[20]

> 3.1 Capital Contributions.  The Capital Contribution of each of the Members as of the date hereof, which has been paid in full, and the number of Class A Units held by each Member as of the date hereof, is set forth opposite such Member's name on Exhibit A.  A Member shall not be required to make additional Capital Contributions to the Company or otherwise lend or advance any funds to the Company and no Member shall be required after the date hereof to pay any contributions, assessments or payments to the Company, whether upon liquidation of the Company or otherwise.

> 3.2 Return of Contributions.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its capital account or its Capital Contributions and an underpaid Capital Contribution is not a liability of the Company or of any Member.  Except as otherwise provided in this Agreement, the Company shall not redeem or repurchase any Units.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return to any Member's Capital Contributions.

> 3.3 Advances by Members.  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the Manager's consent may advance all or part of the needed funds to or on behalf of the Company.  An advance described in this Section 3.3 constitutes a loan from the Member to the Company, bears interest at the prime rate of interest as used by the Company's primary bank from time to time from the date of the advance until the date of payment, and is not a Capital Contribution.

---

[19]  The 428 N. 13th Partners, LLC Agreement is attached to the Motion to Dismiss as Exhibit 1.  (Doc. No. 7-4.)  The 429 N. 13th Partners, LLC Agreement is attached to the Motion to Dismiss as Exhibit 2.  (Doc. No. 7-5.)  The Agreements are quoted at length in order to compare the language of the Agreements to the alleged oral misrepresentations made by Michael Pasquarello.

[20]  The provisions quoted are identical in both the 428 N. 13th Partners, LLC Agreement and the 429 N. 13th Partners, LLC Agreement.

. . .

3.5 Units.  Each Member's share of the Profits and Losses of, and right to receive distributions from, the Company shall be represented by the unit(s) of Membership Interest held by such Member (each, a "Unit" and collectively, the "Units").  The Units shall be comprised of the Class A Units (the "Class A Units") and such future classes of Units as Members holding at least fifty-one percent (51%) of the issued and outstanding Units may from time to time create in accordance herewith.

. . .

4.1 Distributions of Cash Flow and Allocations of Profit or Loss Other than from Capital Transactions

   4.1.1 Profit or Loss Other Than from a Capital Transaction.  After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Unit Holders in proportion to the percentage of Units held by each Unit Holder.

   4.1.2 Cash Flow.  Cash Flow for each taxable year of the Company shall be distributed to the Unit Holders in proportion to the percentage of Units held by each Unit Holder no later than seventy-five (75) days after the end of the taxable year.

4.2 Distribution of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions

   4.2.1 Profit.  After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

   4.2.1.1  If one or more Unit Holders has a Negative Capital Account, to those Unit Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

   4.2.1.2  Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Unit Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.3.

   4.2.1.3.  Any Profit in excess of the foregoing allocations shall be allocated to the Unit Holders in proportion to the percentage of Units held by the Unit Holders.

4.2.2 Loss.  After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1  If one (1) or more Unit Holders has a Positive Capital Account, to those Unit Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2  Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Unit Holders in proportion to the percentage of Units held by the Unit Holders.

4.2.3. Capital Proceeds.  Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Unit Holder); then

4.2.3.3. to the establishment of any reserves which the Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4 the balance shall be distributed as follows:

4.2.3.4.1 to the Unit Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2. if any Unit Holder has a Positive Capital Accounts after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Unit Holders in proportion to their Positive Capital Accounts; then

4.2.3.4.3 the balance, to the Unit Holders in proportion to the percentage of Units held by the Unit Holders.

. . .

10.3 Complete Agreement.  This Agreement constitutes the complete and exclusive statement of the agreement among the Members.  It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.  This Agreement may not be amended without the written consent of Members holding at least fifty-one percent (51%) of the issued and outstanding Units.

(Doc. Nos. 7-4, 7-5 at 6, 8-9, 22.)

The next relevant event regarding the properties at 428 and 429 N. 13th Street is described in paragraph 31 of the Complaint:

> In May 2018, Gordon and Michael Pasquarello purchased the remaining 6 units. 428 N. 13th and 429 N. 13th obtained loans from the bank for the 6 units and included a refinancing for 428 2H purchased in December 2017.  The purchase price for all of the units in 428 and 429 N. 13th Street was $2,800,000.  Gordon, of course, had to put up $803,125.05 for the down payment and closing costs on all the 428 and 429 units.   Gordon and Michael Pasquarello were parties to the $1.2 million mortgage needed to finance the purchase . . . . [21]

(Doc. No. 2 ¶ 31.)

According to Plaintiff, 429 N. 13th Street is "losing money," and one of the units is unoccupied and in need of renovations.  (Id. ¶ 35.)  As of April 22, 2022, the date the Complaint was filed, Plaintiff had advanced more than $80,000 for expenses incurred to maintain the 429 N. 13th Street units.   (Id.)   Plaintiff alleges that under "Michael Pasquarello's previous representations[,] these advances were to bear interest at 8% per annum."  (Id.)  Plaintiff does not comment on the current status of 428 N. 13th Street.  He alleges more generally that Michael Pasquarello did not contribute to maintenance of the properties and that Plaintiff has not received the 8% interest on his investment in 428 and 429 N. 13th Street.[22]  (Id. ¶¶ 35-36.)

---

[21]   Paragraph 31 of the Complaint does not clearly describe the financial terms of the acquisition of the six units.  It appears that the purchase price of the six units and unit 428 2H is $2,800,000.  Gordon apparently advanced $803,125.05 for the down payment and closing costs to acquire all seven units.  If Gordon and Pasquarello were parties to a $1,200,000 mortgage needed to finance the purchase of the seven units, there appears to be a discrepancy of about $800,000 in the amount needed to purchase the properties, which is not accounted for.  In paragraph 33 of the Complaint, Plaintiff increases the amount of the down payment and closing costs to $835,125.05.  (Doc. No. 2 ¶ 33.)

[22]   In the RICO Case Statement, Plaintiff augments his damages to include "the loss in value to the premises resulting from the failure to sell or refinance the property . . . ."  (Doc. No. 20 ¶ 13(a).)

16

4.  <u>Defendant 1310-12 Frankford Ave, LLC</u>

Once again, as an incentive for this investment, Michael Pasquarello offered the same terms as the earlier transactions "on behalf of himself, Jenniphur [sic] Pasquarello, and 1310-12 Frankford [Ave, LLC]."[23]  (<u>Id.</u> ¶¶ 45, 47.)  These statements were made in person and on the phone starting in 2018 and until the investment was finalized.  (<u>Id.</u> ¶ 47.)  Plaintiff also states that he would "receive all the benefits to which the Class A shareholders were entitled under the Operating Agreement." [24]  (<u>Id.</u> ¶ 46.)

This third venture between the parties involved the properties located at 1310-12 Frankford Avenue.  (<u>Id.</u> ¶ 16; Doc. No. 2-5 at 1.)  In 2018, Michael Pasquarello presented the investment opportunity to Plaintiff: the purchase of Class A ownership shares in 1310-12 Frankford Ave, LLC. (Doc. No. 2 ¶ 38.)  1310-12 Frankford Ave, LLC owned the property where Kensington Quarters, another Pasquarello restaurant, had a lease.  (<u>Id.</u>)  As the name of the LLC suggests, the location of Kensington Quarters was 1310-12 Frankford Avenue.  (<u>Id.</u> ¶ 16; Doc. No. 2-5 at 1.)  Plaintiff states that Kensington Quarters was run "under the auspices of defendant HCRP [sic]."  (Doc. No. 2 ¶ 38.)  HRCP paid the rent to 1310-12 Frankford Ave, LLC.  (<u>Id.</u> ¶¶ 43-44.)  The lease was a "triple net lease, in which all the lease payments from HRCP drop to the bottom line and were profits to 1310-12 Frankford Ave, LLC after the payment of the mortgage."  (<u>Id.</u> ¶ 44.)  Plaintiff

---

[23]  In the RICO Case Statement, Plaintiff clarifies that these promises were also made on behalf of HRCP.  (Doc. No. 20 ¶ 1.)

[24]  It is unclear from the Complaint whether Pasquarello promised Plaintiff the benefits of owning the Class A shares.  In Plaintiff's Response to the Motion to Dismiss, he first states: "[i]n addition to and separate from the promises that Michael and Jeniphur Pasquarello made to induce the investment, Jason Gordon had rights to benefits as the owner of Class A shares pursuant to the operating agreement . . . ."  (Doc. No. 11 at 4.)  Later, Plaintiff argues that "Michael further fraudulently promised the benefits of Class A shares."  (<u>Id.</u> at 23.)

was aware of the lease at the time of purchase and therefore "reasonably believed that 1310-12 Frankford [Ave, LLC] had a reliable source of income . . . ." (Id.)

1310-12 Frankford Ave, LLC initially had two members: Michael Pasquarello and Robert Mackey.  (Doc. No. 7-6 at 1.)  The men created this arrangement through a Limited Liability Operating Agreement[25] (the "Operating Agreement"), which was executed on March 20, 2013. (Id. at 1, 8.)  Upon Mackey's passing, his estate assumed his membership.  (See Doc. No. 2 ¶¶ 38-39.)  The estate "owned all of the Class A shares" and was a guarantor of a TruMark Credit Union mortgage on the property, which was "approximately $560,000."  (Id. ¶ 39.)  Michael Pasquarello possessed the Class B shares, which were the only voting shares, giving him control over the property.  (Id. ¶¶ 39, 41.)  He also served as the Manager of the LLC.  (Id. ¶ 41; Doc. No. 7-6 at 1.)  Later, when the estate expressed that it no longer wanted to be a member, Pasquarello sought out Plaintiff as a possible buyer.  (Doc. No. 2 ¶ 40.)  Plaintiff eventually purchased the Class A shares from Mr. Mackey's estate for $100,000 in 2018.  (Id. ¶ 48; Doc. No. 20 at ¶ 1.)  He also assumed the mortgage on the property. [26]  (Id.)

The terms of the Operating Agreement[27] are crucial here and the relevant provisions are reproduced at length below:

---

[25]   The Operating Agreement is attached to the Motion to Dismiss as Exhibit 3.  (Doc. No. 7-6 at 1.)

[26]   In the Motion to Dismiss, Defendants state the following about 1310-12 Frankford Ave, LLC's current structure: "On May 16, 2022, Pasquarello redeemed Gordon's entire interest in 1310-12 Frankford Avenue, LLC per the terms of the 1310-12 Operating Agreement for a redemption price in excess of $475,000, and the release of Gordon as guarantor of the mortgage." (Doc. Nos. 7-3 at 5 n.5; 7-2 at 1-2.)  Plaintiff disputes this point, arguing that the redemption was "totally ineffective" because (1) there was insufficient notice; (2) redemption is improper where "he has guaranteed any obligations of, inter alia, Michael Pasquarella [sic] that remain unpaid;" and (3) the "proffered payment . . . did not satisfy all of the Company's or Michael Pasquarella's [sic] obligations to Jason Gordon . . . ." (Doc. No. 11 at 8 n.3.)

[27]   The attached Operating Agreement is between Michael Pasquarello and Robert Mackey, not between Michael Pasquarello and Plaintiff.  It states that it "is entered into between Robert

3.5 Loans.  Any Member may (but shall not be required to), at any time, make or cause a loan to be made to the Company upon the written consent of the Manager. In the event that such a loan is made, the amount of such loan shall not be treated as a contribution to the capital of the Company, but shall be a debt due from the Company.

4.1 Membership Interests.

(a) Equity ownership in the Company shall be represented by membership interests ("Membership Interests"), which Membership Interests may be uncertificated.

(b) There shall be two separate and distinct classes of Membership Interests in the Company (each, a "Class" of Interests), "Class A Preferred Interests" and "Class B Common Interests," each of which shall carry the rights, preferences and privileges as set forth in this Agreement. . . .

. . .

4.4 Class A Preferred Interests.  In addition to the additional rights, privileges and restrictions set forth in this Agreement, the Class A Preferred Interests shall have the following rights and privileges:

(a) Preferred Return.  Holders of Class A Preferred Interests shall be entitled to receive, out of funds legally available therefor [sic], and the Company shall pay, a sum equal to four and one-quarter percent (4.25%) per annum (the "Class A Preferred Return") (determined on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, for the actual number of days in the period for which such Preferred Return is being determined) on any outstanding capital contribution made by such holder of Class Preferred Interests (the "Unreturned Capital Balance") which relates to such Class A Preferred Interests, commencing on the date such Class A Preferred Interest were issued (the "Original Issue Date").  The Class A Preferred Return shall be payable (i) monthly beginning on October 1, 2013, to the extent it is determined, in the sole discretion of the Manager, that the Company has the ability to pay the Class A Preferred Return out of the profits of the Company, or (ii) to the extent not paid pursuant to clause (i), upon any distribution made in accordance with Section 5.2 or 6.3 or upon any Redemption in accordance with Section 4.4(b).  The Class A Preferred Return shall be cumulative and accrue daily commencing the Original Issue Date, and shall be deemed to accrue from such date whether or not earned or

_____

Mackey and Michael Pasquarello (the 'Founding Members') and any other person who is admitted as a member of the Company . . . ." (Doc. No. 7-6 at 1.) As noted, Plaintiff purchased Mackey's membership that passed to his estate.  Although titled an "Operating Agreement," this document contains terms regarding: (1) the interests of the members in the LLC; (2) issuance of additional membership interests; (3) preferred returns and redemption; (4) capital contributions; and (5) their rights to share in profits and losses.  (See Doc. No. 7-6 at 2-6.)

declared and whether or not there are profits, surplus or other funds of the Company legally available for the payment of such Class A Preferred Return.

. . .

4.7 Additional Capital Contributions.  The Members shall not be required to make additional Capital Contributions to the Company.  Any additional Capital Contributions may only be made upon written consent of the Manager.

. . .

5.1 Allocation of Profits and Losses.  For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule A, as amended from time to time, in accordance with Treasury Regulation 1.704-1.

5.2 Distributions.  Subject to 4.4(c), distributions shall be made to the Members at the times and in the aggregate amounts determined by vote of the Manager.  The priority of distributions made pursuant to this Section 5.2 shall be in accordance with Section 6.3.

. . .

7.3 Entire Agreement.  This Agreement represents the entire limited liability company agreement of the Company within the meaning of the Act.

(Doc. No. 7-6 at 2-4, 6.)

Plaintiff states that under this Operating Agreement, he "was entitled to receive preferred payments and allocations of profits and losses . . . [specifically] to a return of the Class A owner's original capital contribution of $325,000 plus interest at the rate of 4.25% annum and to virtually all profits and losses of the company."  (Doc. No. 2 ¶ 42.)

Plaintiff alleges that Michael Pasquarello, as manager, did not pay Plaintiff his preferred dividend[28] and "concealed from Gordon his obligation to make the preferential payments."[29]  (Id.

---

[28]  Plaintiff alleges that Pasquarello also failed to pay Mackey his preferred dividend while he was a member.  (Doc. No. 2 ¶ 50.)

[29]  Plaintiff notes that he "only reasonably discovered that fact after 2020."  (Id. ¶ 51.)

¶¶ 50-51.)  The preferential payments that "remain due and owing to Gordon [are] in the amount of approximately $124,000, plus interest."[30]  (Id. ¶ 52.)  Further, Pasquarello allegedly failed to "allocate[] the losses pursuant to the LLC agreement, which required virtually all of the losses be allocated to Gordon [as the owner of Class A shares]." [31]  (Id. ¶¶ 53-54.)  According to Plaintiff, Michael Pasquarello "further defrauded" Plaintiff by distributing half of them to himself.  (Id. ¶ 59.)  Plaintiff states that "Defendants have continued their wrongdoing up to the present."[32]  (Id.)

Separately, Plaintiff alleges that Michael Pasquarello, through his control of HRCP [the lessee] and 1310-12 Frankford Ave, LLC [the lessor], did not pay the full rent to 1310-12 Frankford Ave, LLC, thereby diminishing its income and preventing the full rent amount from being applied to expenses and the mortgage.  (Id. ¶¶ 56-57.)  Michael Pasquarello supposedly "diverted money to HRCP," which he exclusively controlled.[33]  (Id.)  Additionally, Michael Pasquarello allowed

---

[30]  Separately, in his Response in Opposition to the Motion to Dismiss the Complaint, Plaintiff argues that the Pasquarellos also failed to pay him the promised 8% interest and that "they misled [him] . . . concerning the parties' supposed plan to quickly sell or refinance the property."  (Doc. No. 11 at 4.)

[31]  In Count II of the Complaint, Plaintiff states that Pasquarello "was only entitled to a mere .003% [of the losses] under the terms of the Operating Agreement."  (Doc. No. 2 ¶ 90.)  The attached Operating Agreement does not contain language on this point.

[32]  It is unclear whether the "wrongdoing" specifically refers to the improper allocation of losses or is meant to encapsulate all wrongdoing referred to in the Complaint.

[33]  Plaintiff again alleges that Pasquarello engaged in the same conduct while Mackey was a member.  (Id. ¶ 57.)

HRCP to obtain an insurance policy[34] that had less coverage[35] than set forth in the lease, which

Plaintiff asserts was a means for Michael Pasquarello to increase HRCP's income by roughly

---

[34] The Lease is attached to the Complaint as Exhibit B. (Doc. No. 2-5.) The Lease is between 1310-12 Frankford Ave, LLC and HRCP and was entered into on October 1, 2014. It states the following:

11. Indemnity; Insurance

. . .

(B) Tenant's Insurance. Tenant shall maintain with financially responsible insurance companies with a Best Rating of not less than A-VIII licensed to do business in the Commonwealth of Pennsylvania: (i) a commercial general liability insurance policy with respect to the Leased Premises and its appurtenances (including without limitation signs) naming Landlord as an additional insured with a limit of not less than One Million and 00/100 Dollars ($1,000,000.00) including liquor liability; (ii) an umbrella liability insurance policy with a limit of not less than Two Million and 00/100 Dollars ($2,000,000.00) naming Landlord as an additional insured; (iii) an insurance policy to cover heating and air conditioning units against damage for one hundred percent (100%) replacement cost; (iv) an all risk property insurance policy insuring all merchandise, leasehold improvements, furniture, fixtures and other personal property, all at their replacement cost; (v) business interruption insurance; and (vi) umbrella coverage for excess liquor liability for at least Ten Million and 00/100 ($10,000,000.00). Tenant shall deliver these insurance policies or certificates thereof, satisfactory to Landlord, issued by the insurance company to Landlord with premiums prepaid prior to the Lease Commencement Date and thereafter at least thirty (30) days prior to each expiring policy. Tenant's failure to deliver the policies or certificates shall constitute a default. All policies of insurance required of Tenant shall have terms of not less than one (1) year.

. . .

33 Plans and Specifications.

(A) If, during the Lease Term or any extensions or renewals thereof, Tenant intends to perform any alterations or any other construction within or to the Leased Premises ("Tenant's Work"), then, prior to performing Tenant's Work, Tenant shall submit to Landlord, for Landlord's written approval, the following items (hereinafter collectively referred to as "Required Items"):

. . .

$10,000 per year, in turn benefitting the Pasquarellos, while setting 1310-12 Frankford Ave, LLC up for a greater chance of liability and loss.  (Id. ¶ 58.)  Plaintiff argues that this action "failed to protect the interests of 1310-12 Frankford [Ave, LLC]. . . ."[36]  (Id.)

### 5.  Café Lift Narberth

The final venture between the parties involves Café Lift Narberth.  Café Lift Narberth was owned by Café Lift Narberth, LLC ("CLN").[37]  (Id. ¶ 60.)  The restaurant was located at 724 Montgomery Avenue in Narberth, Pennsylvania.  (Id.)  Café Lift Narberth closed in January 2020 and had an accumulated debt of roughly $140,000.  (Id. ¶¶ 60, 69.)  Michael Pasquarello owned 30% of CLN.  (Id. ¶ 61.)  Plaintiff owned 70% and was the manager of CLN.  (Id.)  Michael Pasquarello acquired his 30% ownership interest by promising to repay 30% of the opening expenses[38] and "his proportionate share of the operating expenses."  (Id.)  Plaintiff personally advanced more than $626,000 towards the opening expenses.  (Id. ¶ 63.)

---

(iii) A commercial general liability insurance policy from Tenant's contractor's insurer (with a rating of not less than A-VIII) naming Landlord and Landlord's mortgagee as additional insured for at least Three Million and 00/100 Dollars ($3,000,000.00) combined single limit for bodily injury and property damage and contractor's Workers' Compensation and Occupational Disease insurance with statutory limits and employer's liability with a limit of at least One Million and 00/100 Dollars ($1,000,000.00).

(Doc. No. 2-5 at 1, 14, 26.)

[35]  Plaintiff does not provide further details on, nor does he attach a copy of, the insurance policy. It is therefore unclear how the insurance policy differs from what the lease requires, other than that it provides less coverage.

[36]  From the transaction involving 1310-12 Frankford Ave, LLC, Plaintiff also asserts the following harm in his RICO Case Statement: "the loss in value to the premises resulting from the failure to sell or refinance the property and split the proceeds after repaying Gordon for his investment . . . ."  (Doc. No. 20 ¶ 13(b).)

[37]  See n. 12, supra.

[38]  Plaintiff states that 30% of the opening expenses would equal $187,800.  (Doc. No. 2 ¶¶ 6, 64.)

The Pasquarellos managed Café Lift Narberth's operations and oversaw its finances. (Id. ¶ 62.) According to Plaintiff, the Pasquarellos informed him that their skill would enable the restaurant to become prosperous enough to "(a) repay the Opening Expenses; (b) pay the rent, utilities and other expenses under the triple net lease then in effect; and (c) cover their management fees."[39] (Id. ¶ 65.) From 2017 to 2020, the Pasquarellos made these statements in person and over the phone. (Id. ¶ 66.) As managers, the couple "received all end of day reports and were to attend all operations meetings." (Id. ¶ 62.)

Plaintiff further asserts that the Pasquarellos, while at Café Lift Narberth, "failed to, inter alia, control the cost of goods and labor, attend regularly scheduled meetings, communicate with the on-site manager of the restaurant[,] and increase sales." (Id. ¶ 69.) The Pasquarellos also did not: (1) pay their portions of the operating expenses or of the opening expenses; (2) pay the employees their full wages as they failed to "deliver[] over $11,000 worth of paychecks, and otherwise [did] not properly handl[e] those checks;"[40] and (3) keep the books and records, therefore subjecting CLN and Plaintiff "to claims by employees and[/]or the Commonwealth of Pennsylvania" because he is unable to "determine the amounts due to the vendors and employees." (Id. ¶¶ 70-71.) Lastly, Plaintiff argues that the couple improperly paid themselves $110,000 in unearned management fees and subsequently purchased a home in Ventnor, New Jersey during this time. (Id. ¶ 72.) Plaintiff believes that these actions "drove Café Lift Narberth out of business, for reasons having nothing to do with the Covid 19 pandemic." (Id. ¶ 68.)

---

[39] In his RICO Case Statement, Plaintiff states more specifically that the couple would "take management fees only from profits." (Doc. No. 20 ¶ 1.)

[40] Plaintiff alleges that this conduct is a common business practice employed by the Pasquarellos. (See Doc. No. 2 ¶ 70.)

Given the complexity and number of transactions, a master chart follows to assist in comprehending the various transactions set forth above:



Transaction 1: 501 N. 13th Street

The Pasquarellos

13th Street Kitchens

Prohibition Taproom

501 N. 13th Street

501 N. 13th Partners, LLC

Plaintiff (75%)    Michael Pasquarello (25%)

Transaction 2: 428 and 429 N. 13th Street[41]

The Pasquarellos

13th Street Kitchens

Café Lift

428 N. 13th Street

428 N. 13th Partners, LLC

Plaintiff (50%)    Michael Pasquarello (50%)

*Located at*

*Owned by*

Transaction 3: 1310-12 Frankford Avenue, LLC

The Pasquarellos

Michael Pasquarello

Defendant HRCP

Kensington Quarters

1310-12 Frankford Avenue

Defendant 1310-12 Frankford Ave, LLC

Plaintiff    Michael Pasquarello

*Owned*

*Owned*

*Located at*

*Owned by*

Transaction 4: Café Lift Narberth

The Pasquarellos

Café Lift Narberth

724 Montgomery Avenue

Café Lift Narberth, LLC

Plaintiff (70%)    Michael Pasquarello (30%)

*Managed*

*Located at*

---

[41]  As noted earlier, this transaction also involved the acquisition of four units located at 429 N. 13th Street. (Id. ¶¶ 29, 31.) However, the restaurant Café Lift was located at 428 N. 13th Street. (Id. at ¶¶ 26, 28.)  428 N. 13th Partners, LLC took over the three units located at 428 N. 13th Street.  (Id. at ¶ 29.)

### C.  Procedural History

Plaintiff filed his Complaint on April 22, 2022.  (Doc. No. 2.)  He alleges the following

claims and requests for relief:

- a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") violation, 18 U.S.C. § 1962(c), against all Defendants (Count I);

- shareholder oppression [and seeking the] appointment of a custodian under 15 Pa. Cons. Stat. Ann. § 1767 against Michael Pasquarello, HRCP, and 1310-12 Frankford Ave, LLC (Count II);

- breach of fiduciary duty against Michael Pasquarello (Count III);

- breach of 1310-12 Frankford Ave, LLC's Operating Agreement against Michael Pasquarello and 1310-12 Frankford Ave, LLC (Count IV);

- breach of contract against Michael Pasquarello (Count V);

- monies owed by the Pasquarellos against the Pasquarellos (Count VI);

- breach of the management agreement against the Pasquarellos (Count VII); and

- accounting under the management agreement against the Pasquarellos (Count VIII).

(See id.)

On June 13, 2022, Defendants filed the Motion to Dismiss.  (Doc. No. 7-3.)  Specifically,

Defendants move to dismiss: (1) Count I of the Complaint as to all Defendants for failure to state

a claim; (2) Counts VI, VII and VIII as to Jeniphur Pasquarello for failure to state a claim; and (3)

all remaining counts as to all Defendants for lack of subject matter jurisdiction.  (Id.)

Plaintiff filed a Response in Opposition on July 5, 2022.  (Doc. No. 11.)  A hearing on the

Motion was held on September 15, 2022.  Plaintiff submitted a RICO Case Statement on

September 30, 2022.  (Doc. No. 20).  On October 18, 2022, Plaintiff filed a Supplementary

Memorandum in Opposition to the Motion.  (Doc. No. 23.)  The Motion has been fully briefed and is ripe for disposition.

## III.    STANDARDS OF REVIEW

### A.  Motion to Dismiss Standard under Federal Rule of Civil Procedure 12(b)(6) – Failure to State a Claim

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678 (citation omitted); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id.  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a District Court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). This "plausibility pleading standard" is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

"[A] complaint must do more than allege the plaintiff's entitlement to relief. . . . [It must] 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).

### B.  Motion to Dismiss Standard under Federal Rule of Civil Procedure (12)(b)(1) – Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal on the grounds that the Court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

"At issue in a Rule 12(b)(1) motion is the court's very power to hear the case." Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006) (internal quotation marks omitted). There are two types of Rule 12(b)(1) motions: those that attack a court's subject matter jurisdiction on the complaint's face and those that attack subject matter jurisdiction as a matter of fact. Id. at 302 n. 3. Where a defendant does not challenge the truthfulness of the facts material to a jurisdictional analysis, a court evaluates the motion as a facial attack, and it accepts the plaintiff's factual allegations as true in assessing whether the court has jurisdiction. Id. Where a defendant challenges factual allegations that are material to the court's jurisdiction, there is no presumption of truthfulness for plaintiff's allegations, and "the existence

of disputed material facts will not preclude [the court] from evaluating for [itself] the merits of [a] jurisdictional claim[ ]." Id.

J. Ambrogi Food Distrib., Inc. v. Teamsters Loc. Union No. 929, 595 F. Supp. 3d 352, 357 (E.D. Pa. 2022).

## IV.   ANALYSIS

### A.  Motion to Dismiss under Federal Rule of Civil Procedure (12)(b)(6) for Failure to State a Claim

First, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff argues that: (1) Count I of the Complaint containing the RICO claim should be dismissed against all Defendants and (2) that Counts VI, VII, and VIII containing state law claims should be dismissed against Jeniphur Pasquarello.  (Doc. No. 2.)  Because the RICO claim alleged in Count I does not state a claim to relief plausible on its face, it is dispositive to dismissing the entire case.  Accordingly, the Court need not address Defendants' other Rule 12(b)(6) arguments as to Jeniphur Pasquarello.

#### 1.  Introduction and Elements of RICO

The congressional purpose in enacting RICO is "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969)[.]  The provisions of RICO encompass complex crimes involving multiple elements.  Although RICO is a criminal offense, the statute also provides civil remedies to plaintiffs injured by RICO activity.  18 U.S.C. § 1964(c).

Irish v. Ferguson, 970 F. Supp. 2d 317, 343-44 (M.D. Pa. 2013).

RICO prohibits four kinds of activity.  See 18 U.S.C. § 1962(a)-(d).  In Count I of the Complaint, Plaintiff asserts that Defendants violated only one of the four.  (Doc. No. 2 ¶¶ 77-78, 84.)  The one alleged is codified in 18 U.S.C. §1962(c).

Specifically, Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  This subsection "is restricted to persons 'employed by or associated with' an enterprise that is engaged in racketeering activity."  Irish, 970 F. Supp. 2d at 344 (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)).

To assert a Section 1962(c) claim, one "must allege that a 'person' employed by or associated with an enterprise engaged in the following: '(1) conduct[ed] (2) [] an enterprise (3) through a pattern (4) of racketeering activity.'"  Schwartz v. Laws. Title Ins. Co., 680 F. Supp. 2d 690, 703 (E.D. Pa. 2010) (citation omitted); Gratz v. Ruggerio, 822 F. App'x 78, 80-81 (3d Cir. 2020) (citation omitted).

### a.   Person

Under RICO, a "person" is defined as: "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).

### b.   Enterprise

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Id. § 1961(4).  An association-in-fact enterprise may be pled by showing: "(i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity."  Schwartz, 680 F. Supp. 2d at 706 (citation omitted).  Further, it "must have at least three structural features: [i] a purpose, [ii] relationships among those associated with the enterprise, and [iii] longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009).

Importantly, Section 1962(c) also contains what is known as a distinctiveness requirement. The alleged "person" who is "subject to liability [for a RICO violation] cannot be the same entity

as the 'enterprise.'"  See Sunlight Elec. Contracting Co., Inc. v.Turchi, 918 F. Supp. 2d 392, 401

(E.D. Pa. 2013) (citation omitted); Stoss v. Singer Fin. Corp., Civil Action No. 08-5968, 2010 WL

678115, at *5 (E.D. Pa. Feb. 24, 2010) ("Section 1962(c) requires that the RICO defendant or

'person' is separate and distinct from the alleged RICO 'enterprise.' . . . [T]he RICO 'enterprise'

cannot simply be the 'person' referred to by a different name.") (citations omitted)).  When a

corporation is involved, the analysis expands.

> In the context of an allegation involving a corporate entity, a plaintiff asserts a valid
> claim under Section 1962(c) when he alleges that a corporate owner or employee
> who is distinct from the corporation itself "conducts the corporation's affairs in a
> RICO-forbidden way."  Kushner, 533 U.S. at 163.  In such a situation, the owner
> or employee is the "person" and the corporation is the "enterprise."  Id.  However,
> a claim that the corporation is the "person" and the corporation together with its
> employees and agents is the "enterprise," will not withstand a motion to dismiss.
> Id. at 164 (citing Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30
> F.3d 339, 344 (2d Cir.1994)).  Similarly, a reference to the corporation as both the
> "person" and as the "enterprise" within a complaint is a fatal defect.  See Zavala v.
> Wal–Mart Stores, Inc., 447 F.Supp.2d 379, 383–84 (D.N.J. 2006).

Stoss, 2010 WL 678115, at *5.  Under the distinctiveness requirement, the enterprise also must be

"distinct from the alleged pattern of racketeering activity."  Schwartz, 680 F. Supp. 3d at 704.

### c.   Pattern of Racketeering Activity

#### i.   Racketeering Activity

Section 1961 provides an extensive list of racketeering activities, encapsulating a bevy of

crimes, some containing fraudulent actions, such as mail and wire fraud.  18 U.S.C. § 1961(1).  If

a plaintiff alleges racketeering activities rooted in fraud, he or she must meet the standard set forth

in Federal Rule of Civil Procedure 9(b), which states: "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

Specifically, this means a plaintiff "must describe the circumstances of the alleged fraud with

precise allegations of date, time, or place or otherwise use some means of injecting precision and

some measure of substantiation into their allegations of fraud." <u>Ketner v. Widell</u>, No. 5:20-cv-6360, 2021 WL 2808829, at *8 (E.D. Pa. July 6, 2021) (internal quotation marks and citation omitted).

      ii.   <u>Pattern</u>

A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Importantly, it is not enough to plead a mere pattern of racketeering activity; instead, one must show two additional elements: (1) relatedness and (2) continuity. <u>See United States v. Bergrin</u>, 650 F.3d 257, 267 (3d Cir. 2011) (citation omitted). Relatedness is defined as follows: "the criminal activities 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" <u>Id.</u> (citation omitted). Continuity may be characterized as closed or open. <u>See id.</u> (citation omitted). Closed-ended continuity is "a closed period of repeated conduct . . . [that] can be established 'by proving a series of related predicates extending over a substantial period of time.'" <u>Germinaro v. Fid. Nat'l Title Ins. Co.</u>, 737 F. App'x 96, 102 (3d Cir. 2018) (internal quotation marks and citation omitted). The meaning of "substantial" has not been clearly defined, but a pattern of activity alleged to have lasted more than three years has been declared substantial. <u>See Tabas v. Tabas</u>, 47 F.3d 1280, 1294 (3d Cir. 1995) (citations omitted); <u>Liberty Bell Bank v. Rogers</u>, 726 F. App'x 147, 155 (3d Cir. 2018) ("[H]e engaged in an overall scheme that extended from at least 2010 to 2013, a period of time sufficient to satisfy the continuity requirement of RICO.") (citing <u>Tabas</u>, 47 F.3d at 1294)). Open-ended continuity, by contrast, consists of "past conduct that by its nature projects into the future

with a threat of repetition." Bergrin, 650 F.3d at 267 (internal quotation marks and citation omitted). The threat of repetition "exists when the predicate acts are a part of defendant's 'regular way of doing business' . . . [or the] defendant operates a 'long-term association that exists for criminal purposes.'" Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609-10 (3d Cir. 1991) (citation omitted).

### 2.   Plaintiff's RICO-Element Allegations

#### a.   Plaintiff Has Not Alleged a RICO Enterprise in Count I

Plaintiff asserts in the Complaint that Defendants created an enterprise, which he refers to broadly as the "Taking From Jason Gordon Enterprise." (Doc. No. 2 ¶¶ 75-78.) Defendants argue to the contrary that Plaintiff does not properly assert the existence of a RICO enterprise. (See Doc. No. 7-3 at 13-14.) Specifically, they contend that Plaintiff's enterprise allegations are conclusory and do not satisfy Section 1962(c)'s distinctiveness requirement. (See id. at 13.)

In his Complaint, RICO Case Statement, Response to the Motion to Dismiss, Supplemental Response to the Motion to Dismiss, and at the hearing on the Motion to Dismiss, Plaintiff describes the existence of five different enterprises, obviously doing so because of the definitional limits RICO poses in order to sufficiently state a claim. Under each variation, he is unsuccessful. On a Motion to Dismiss, however, the Court need only consider the allegations in the Complaint and the RICO Case Statement to decide whether, taking the allegations as true, Plaintiff has plausibly alleged the existence of a RICO enterprise.

#### i.   The Enterprise as Described in the Complaint

First, the description of the alleged enterprise in the Complaint is insufficient because it merely recites the terms of the statute. Plaintiff states: "[t]he defendants formed an association-in-fact for the purpose of profiting from Gordon, which is referred to as the 'Taking From Jason

Gordon Enterprise.'" (Doc. No. 2 ¶ 75.) He alleges that "[t]he Taking From Jason Gordon Enterprise was an 'enterprise' within the meaning of RICO, 18 U.S.C.A. § 1961(4)." (Id. ¶ 76.) He then states that this alleged enterprise "was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C.A. § 1962(c)." (Id. ¶ 77.) Finally, he notes that "[e]ach of the defendants were [sic] associated with this enterprise and conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a 'pattern of racketeering activity' within the meaning of RICO, 18 U.S.C.A. § 1961(5), in violation of § 1962(c)." (Id. ¶ 78.) These are merely conclusions which are not entitled to the presumption of truth. See Burtch v. Milberg Factors, Inc., 662 F.3d 212, 224 (3d Cir. 2011) ("[M]ere restatements of the elements of [a] claim [] . . . are not entitled to the assumption of truth.") (citing Santiago, 629 F.3d at 131).

To obtain further clarification on what is the enterprise, the Court questioned Plaintiff's counsel at the hearing on the Motion to Dismiss about the composition of the enterprise. The following exchange occurred:

The Court: What is the enterprise here?

Plaintiff's Counsel: The Complaint pleads what the association is in Paragraph[s] 77 and 78.

. . .

The Court: That's the, uh, that's the pattern of racketeering activity. That's the, uh, the offenses you are alleging. Where is the enterprise defined in the Complaint? What is the enterprise?

Plaintiff's Counsel: Paragraph 75 says the defendants formed an association in fact for the purpose of profiting from Gordon, which is referred to as the Taking from Jason Gordon Enterprise.

The Court: Alright, now, that to me, is a, a conclusion, it could be a legal conclusion which we don't consider under the Motion to Dismiss under Iqbal and Twombly. What is the enterprise, the enterprise that is alleged in this Complaint?

35

Plaintiff's Counsel: The enterprise is the association of the defendants that was formed with a structure to take money from Jason Gordon.

The Court: Well, uh, the association is a, a what?  A structure?  Is an association of the defendants?  We have two defendants.

Plaintiff's Counsel: The enterprise is the association.

The Court: Alright, but what is the enterprise?  That's what I'm asking you.

Plaintiff's Counsel: The enterprise is the association of the defendants that was formed for the purpose of taking money from Jason Gordon.

The Court: Alright, so you're saying the enterprise is the two defendants. . . . Jeniphur and Michael Pasquarello.  That's the enterprise?

Plaintiff's Counsel: And the other LLCs.

…

The Court: That's the enterprise?

Plaintiff's Counsel: Yes.

The Court: And that's the sole enterprise you are relying upon for the RICO claim?

Plaintiff's Counsel: Yes.

. . .

The Court: I'm having some um, some difficulty here with the enterprise and the mail and wire fraud.

Plaintiff's Counsel: And I'm not sure why your Honor's having a problem with it, with the definition of the enterprise.

The Court: Well, your enterprise is two defendants.  Um, uh, is that an ongoing organization, formal or informal, that the various associates function as a continuing unit, that the enterprise has an existence separate and apart from the alleged pattern of racketeering activity.  I'd have to take a close look and see whether or not two persons who enter into, uh, who do business with somebody else could constitute an association-in-fact enterprise.  I would have to take a close look at that.

Plaintiff's Counsel: It's two persons and two entities. . . .

36

The Court: What are the entities?

Plaintiff's Counsel: 1310-12 Frankford Avenue, LLC and HC- HRCP Restaurants, Inc.

Oral Argument at 48:27-50:45, 57:43-58:52.

Thus, according to the Complaint and Plaintiff's counsel's subsequent representations, the enterprise apparently consists of Michael and Jeniphur Pasquarello and the two defendant corporations, 1310-12 Frankford Ave, LLC and HRCP.  But as noted above, the "person" who is the defendant and the enterprise cannot be the same.  The Pasquarellos,1310-12 Frankford Ave, LLC, and HRCP are Defendants here.  Thus, the distinctiveness element is violated, and the enterprise is not sufficiently alleged in the Complaint.  Accordingly, this first alleged enterprise is deficient.

ii.   The Enterprise as Described in the RICO Case Statement

After the hearing, the Court ordered that Plaintiff file a RICO Case Statement, which essentially seeks plausible factual support for the elements of a RICO violation.  Plaintiff again described the enterprise in response to the questions in the RICO Case Statement.

First, in response to "[s]tate whether the alleged predicate acts relate to each other as part of a common plan," he wrote:

> The role of the 13th Street Kitchen "collective" is presently unknown, though its proclaimed existence testifies to the relatedness of the Enterprise participants.  The participants in the Enterprise and in the "collective" that Michel and Jenniphur [sic] publicly claim to control overlap except that two participants in the collective – LaChinesca and Café Lift Haddonfield – are not known to be participants in the Enterprise (and the latter is irrelevant as it opened in 2022).

(Doc. No. 20 ¶ 4(e).)

Second, in response to: "[d]escribe in detail the alleged 'enterprise' for each RICO claim," and specifically "state the name of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise," he wrote:

37

> The defendant persons who constitute the Taking From Jason Gordon Enterprise
> are Michael Pasquarello, Jenniphur [sic] Pasquarello, 1310-12 Frankford Ave,
> LLC, HRCP Restaurants, Inc., Prohibition Taproom, LLC, and Café Lift, Inc.

(Id. ¶ 5(a).)

Third, in replying to "a statement of whether any defendants are employees, officers, or

directors of the alleged enterprise," Plaintiff wrote:

> The Enterprise . . . was an association in fact with no formal hierarchy.  Michael
> and Jenniphur [sic] controlled and directed the Enterprise which substantially
> corresponds, in structure, to the 13th Street Kitchen "collective" which Jenniphur
> [sic] and Michael hold out as an actually related group of entities (the difference is
> that two of the five entities in the "collective" were not involved in the taking from
> Jason Gordon Enterprise (one of which did not exist during the operation of the
> Enterprise)[)].

(Id. ¶ 5(c).)

Fourth, in being asked for "a statement of whether any defendants are associated with the

alleged enterprise," Plaintiff answered: "[a]ll the defendants were associated with the enterprise as

participants."  (Id. ¶ 5(d).)

Fifth, in replying to "a statement of whether plaintiff is alleging that the defendants are the

individuals or entities separate from the alleged enterprise or that the defendants are the enterprise

itself, or members of the enterprise," Plaintiff wrote:

> The defendants are individuals and entities separate from the Enterprise.  Those six
> separate legal persons are distinct from their collective association in an Enterprise.
> The separate persons who participated in the Enterprise by concerted action in
> which husband, wife, and the defendant entities defrauded Jason Gordon . . . .  The
> defendants also acted in concert for purposes unrelated to the Enterprise, i.e., to
> conduct the business of the 13th Street Kitchen collective which Jenniphur [sic]
> and Michael publicly hold out as a related group of separate businesses which they
> control, and which are in fact owned by independent legal entities.

(Id. ¶ 5(e).)

Later, in response to "state and describe in detail whether plaintiff is alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity," Plaintiff wrote:

> The Enterprise is an association-in-fact that functioned as a unit and which engaged in lawful activity separate and apart from the criminal and illegal activity described above, i.e., it operated a group of related restaurants which was distinguishable from the real estate transactions which form the core of Plaintiff's RICO allegations and was also distinguishable from the willful plundering of one restaurant, Café Lift Narberth, owned by Jason not by the Pasquarellos. The Enterprise was an association-in-fact with no formal hierarchy that is evidenced by the pattern of RICO activities in which the defendants engaged. . . . The existence of the 13th Street Kitchen "collective" (publicly held out by Michael and Jenniphur [sic] as an actual association) is evidence of its participants' relationship which substantially overlaps that of the Enterprise.

(Id. ¶ 6.)

The RICO Case Statement does not clarify which alleged enterprise is relied upon by Plaintiff. At least two enterprises are described. The first one is an association of the Pasquarellos, 1310-12 Frankford Ave, LLC, HRCP, Prohibition Taproom, LLC and Café Lift, Inc. The second one is the 13th Street Kitchen collective, which includes the five named restaurants. The RICO Case Statement excludes as associates of this enterprise the restaurants named LaChinesca and Café Lift Haddonfield.

Regarding the first alleged enterprise described in the RICO Case Statement, Plaintiff apparently recognized the insufficiency of this enterprise under the distinctiveness requirement, so he now includes as associates in the enterprise Prohibition Taproom, LLC and also Café Lift, Inc. Regarding the entity Café Lift, Inc., no such entity is described in the Complaint. There is a Café Lift Narberth, LLC, which owns Café Lift Narberth located at 724 Montgomery Avenue, and also a Café Lift restaurant located at 428 N. 13th Street. In the RICO Case Statement, Plaintiff states: "428 and 429 N. 13th Street, where defendant Café Lift (owned by Michael and Jenniphur [sic]

Pasquarello) was a tenant." (Doc. No. 20 ¶ 1.) Giving Plaintiff the benefit of all inferences in his favor, the reference to Café Lift, Inc. appears to be to the restaurant. If it is, the restaurant is just an entity owned by 13th Street Kitchen, which is owned by the Pasquarellos. Later in the RICO Case Statement, however, Plaintiff returns to using Café Lift, Inc. by stating that "Defendants Michael and Jenniphur [sic] Pasquarello and Café Lift[,] Inc. are jointly and severally responsible" for Plaintiff's alleged damages. (Id. ¶ 13(a).)

Prohibition Taproom, LLC also is not mentioned in the Complaint. The RICO Case Statement asserts that Prohibition Taproom, LLC is a defendant, but then later states that "defendant Prohibition Taproom (owned by Michael and Jenniphur [sic] Pasquarello) is a tenant." (Doc. No. 20 ¶ 1.) Prohibition Taproom was located at 501 N. 13th Street. (Doc. No. 2 ¶ 22.) Plaintiff is apparently equating Prohibition Taproom, LLC with Prohibition Taproom the restaurant. Like Café Lift, Inc., however, there is no description in the Complaint of what Prohibition Taproom, LLC is and what its relationship is to the Pasquarellos, 1310-12 Frankford Ave, LLC, and HRCP. Without this information for both entities, the alleged enterprise does not function as an ongoing organization and a continuing unit.

In any event, even if these two entities somehow relate to the Pasquarellos, pulling them into the enterprise does not transform the enterprise which violates the distinctiveness requirement into a viable one. The reason Prohibition Taproom, LLC and Café Lift, Inc. have now been inserted into the enterprise is not provided. The facts in the Complaint do not describe whether these entities are separate corporations or are actually the restaurants themselves, do not allege that the entities had any involvement in their respective transactions, and do not claim that they received any benefit from the transactions. Plaintiff agrees that the transaction involving 501 N. 13th Street, where Prohibition Taproom was located, was legitimate and he did not lose any money.

40

He was able to successfully refinance this property.  Prohibition Taproom, as a restaurant, therefore benefited Plaintiff.

A comparison of the placement of the other two entities in the alleged enterprise, 1310-12 Frankford Ave, LLC and HRCP, with the placement of Prohibition Taproom, LLC and Café Lift, Inc., shows that the two new entities lack a relationship with the other two.  Plaintiff alleges that the original two named defendant entities, 1310-12 Frankford Ave, LLC and HRCP, were involved in the 1310-12 Frankford Ave, LLC transaction.  (See id. ¶¶ 38-59.)  Specifically, Plaintiff purchased shares in 1310-12 Frankford Ave, LLC, which "owned the property where Michael Pasquarello and Jenniphur [sic] Pasquarello leased space to operate their Kensington Quarters restaurant under the auspices of defendant HCRP [sic]." (Id. at ¶ 38.)  Further, HRCP paid rent to 1310-12 Frankford Ave, LLC.  (Id. at ¶ 44.)  Additionally, Pasquarello utilized his control of 1310-12 Frankford Ave, LLC and HRCP "by having HRCP pay less than the required full triple net lease amount to 1310-12 Frankford [Ave, LLC]" and "by permitting HRCP to carry less insurance coverage than the lease required . . . ." (Id. ¶¶ 57-58.)  As to Prohibition Taproom, LLC and Café Lift, Inc., however, no information is provided in the Complaint.  Rather, assuming they refer to the restaurants, the Complaint simply describes their locations.  (See id. at ¶¶ 22, 26, 28.)  Moreover, HRCP and 1310-12 Frankford Ave, LLC only concern the operation of one location at which the restaurant Kensington Quarters was located.

Furthermore, Plaintiff describes the associates in the enterprise as follows:

> The defendant persons who constitute the Taking From Jason Gordon Enterprise are Michael Pasquarello, Jenniphur [sic] Pasquarello, 1310-12 Frankford Ave, LLC, HRCP Restaurants, Inc., Prohibition Taproom, LLC, and Café Lift, Inc.

(Doc. No. 20 ¶ 5(a).)

He states that these are "the defendant persons" who constitute the enterprise, obviously adding Prohibition Taproom, LLC and Café Lift, Inc. as defendants. This enterprise also fails under the distinctiveness impediment. The defendant "persons" who conduct the enterprise (assuming the addition of the two new defendants) cannot be the same as the associates of the enterprise. Therefore, the first proposed enterprise described in the RICO Case Statement fails to satisfy the enterprise element of a Section 1962(c) RICO violation.

Regarding the second enterprise described, which consists of the 13th Street Kitchen collective and its five restaurants[42] (i) Café Lift, (ii) Prohibition Taproom, (iii) Kensington Quarters, (iv) KQ Burger, and (iv) LaChinesca, this enterprise also fails to meet the enterprise element of the RICO violation.

In the Supplemental Response to the Motion to Dismiss, Plaintiff highlights his reliance on this new enterprise as follows:

> The Pasquarellos have publicly held themselves out as participants in an enterprise that they term the Thirteen[th] Street Kitchen "collective." Their website describes that "collective" as an actually existing association-in-fact which exists independent of themselves, to advance the members' shared interests in the restaurant business. That "collective" enterprise is not a purely criminal enterprise . . . . The members of the enterprise here are the Pasquarellos, their restaurants Café Lift, La Chinesca, Café Lift Haddonfield, Prohibition Taproom, and Kensington Quarters, which on information and belief are separate corporate entities, and possibly other persons interested in the business of the "collective."

(Doc. No. 23 at 5-6) (emphasis added).

Thus, it appears that the members of this enterprise are the Pasquarellos and their restaurants Café Lift, LaChinesca, Café Lift Haddonfield, Prohibition Taproom, and Kensington

---

[42] It should be noted that in the RICO Case Statement, in response to the directive to "list alleged wrongdoers, other than defendants listed above, and state the alleged misconduct of each wrongdoer," Plaintiff answered: "[t]he nature and activities of this 'collective' are not yet fully known, but to the extent it participated in the wrongdoing of the Pasquarellos or the defendant entities, it may be jointly and severally liable for their wrongdoing."  (Doc. No. 20 ¶ 2.)

Quarters.  But Café Lift Haddonfield and LaChinesca were specifically excluded from the enterprise in the RICO Case Statement and as noted previously, Café Lift Haddonfield did not exist until 2022.  (See Doc. No. 20 ¶ 4(e).)

So once again, viewing the facts in the Complaint and the RICO Case Statement in the light most favorable to Plaintiff, the separate restaurants and the Pasquarellos do not form an ongoing organization that functions as a continuing unit.  The restaurants are distinct from each other.  It again appears that this new 13th Street Kitchens collective combination of entities was created to overcome the distinctiveness impediment of the other enterprises described above and to give the appearance that an enterprise existed, which it fails to do.  Moreover, the restaurants by themselves, unmoored to their corporate sponsors which own the real estate, render them unrelated.  They do not coalesce into an ongoing organization that operates as a continuing unit.

In sum, knowing the large hurdle Plaintiff had to overcome to create an enterprise independent of Defendants, he has painted with a broad brush and tried several approaches, none of which are sufficient to withstand a Motion to Dismiss.  Accordingly, Plaintiff is unable to meet the enterprise element of a Section 1962(c) violation.

### b.  Plaintiff Has Not Alleged a Pattern of Racketeering Activity

Plaintiff argues in his Complaint that he has sufficiently alleged another element of a Section 1962(c) violation: a pattern of racketeering activity.  As noted earlier, a pattern of racketeering activity requires at least two predicate acts.  18 U.S.C. § 1961(5).  These predicate acts consist of criminal offenses listed in 18 U.S.C. § 1961(1), which is set forth in the definitional section of the RICO statute describing what racketeering activity means.

Here, Plaintiff alleges that three offenses constitute the racketeering activity: (1) mail fraud, in violation of § 1341; (2) wire fraud, in violation of § 1343[43]; and (3) theft by deception under state law, in violation of 18 Pa. C.S.A. § 3922. (Doc. No. 2 ¶ 79.) He further states that Defendants "committed themselves, or aided and abetted in the commission of, at least two or more of these predicate acts" and that the acts "constitute a 'pattern of racketeering activity' within the meaning of 18 U.S.C.A. § 1961(5)." (Id. ¶¶ 81-82.) Defendants argue to the contrary that Plaintiff's allegations do not show a pattern of racketeering activity because they are conclusory and the fraud claims do not meet Federal Rule of Civil Procedure 9(b)'s pleading requirements. (See Doc No. 7-3 at 16.)

Viewing the allegations in the Complaint and the RICO Case Statement in the light most favorable to Plaintiff, these offenses, as alleged by Plaintiff, do not constitute racketeering activities. Two of the predicate offenses are easy to dispose of. First, theft by deception, a crime under Pennsylvania state law, is not listed in the RICO statute as a predicate offense that is a "racketeering activity."[44] See 18 U.S.C. § 1961(1). Regarding mail fraud, the use of the mails is an element of the offense. See Irish, 970 F. Supp. 2d at 357 (citation omitted). There is no allegation here that the mails were used in furtherance of the alleged scheme to defraud. Thus,

---

[43] The correct section for wire fraud is 18 U.S.C. § 1343. 18 U.S.C. § 1346 states: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. This provision does not apply here.

[44] Under Section 1961(1)(A), the state law offenses that qualify as racketeering acts are:

any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year.

18 U.S.C. § 1961(1)(A).

Plaintiff is left to rely upon two or more acts of wire fraud as constituting the racketeering activity.[45]

 Wire fraud consists of the following elements: "(1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme with the specific intent to defraud; and (3) the use of . . . wire communications in furtherance of the fraudulent scheme." <u>Sunlight Elec. Contracting Co., Inc.</u>, 918 F. Supp. 2d at 402 (internal quotation marks and citations omitted). The underlying scheme "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." <u>Id.</u> (internal quotation marks and citations omitted).  Further, the wire fraud statute specifically highlights that the wire fraud must be "in interstate or foreign commerce."  18 U.S.C. § 1343.

 To meet the interstate element, Plaintiff alleges in the RICO Case Statement that the calls were "too numerous to identify particular dates [and that] [m]any . . . were made . . . [sic] from the Pasquarellos' home in New Jersey to Gordon in Pennsylvania."  (Doc. No. 20 ¶ 4(b).)  He then alleges that the relevant fraudulent acts are as follows:

 1) Inducing Gordon to purchase and/or take on debt for the purchase of properties in which defendants contributed nothing but gained an interest by false and fraudulent representations as alleged above in paragraphs 19-37

 2) Inducing Gordon to purchase ownership in limited liability companies by false and fraudulent representations as alleged above in paragraphs 26-37; 44-49; 55-57; 59

 3) Defrauding Gordon by stealing from him the monies to which he was entitled as owner of the Class A units of 1310-12 Frankford limited liability company as alleged above in paragraphs 38-59

 4) Inducing Gordon to make loans and advances defendants never intended to repay as alleged above in paragraphs 26, 29, 31, 34, 50, 53

---

[45] This conclusion is supported by Plaintiff's RICO Case Statement, which only relies on wire fraud as the predicate act of racketeering activity.  (<u>See</u> Doc. No. 20 ¶ 4(a).)

5) Inducing Gordon to retain defendants to manage Café Lift Narberth by false and fraudulent representations as alleged above in paragraphs 60-72

6) Taking funds from Café Lift Narberth in the guise of management fees to which they were not entitled as alleged above in paragraph 62-74

7) Using funds to which they were not entitled to purchase assets including a vacation home in Ventnor, New Jersey as alleged above in paragraph 72

(Doc. No. 2 ¶ 78.)

The first hurdle that Plaintiff must overcome is whether these allegations can be classified as fraudulent or whether they merely arise from a breach of the contracts he entered into with the Pasquarellos: (i) the 428 N. 13th Partners, LLC Agreement and the 429 N. 13th Partners, LLC Agreement and (ii) the 1310-12 Frankford Ave, LLC Operating Agreement.  Further, the Court will consider the allegations pertaining to Café Lift Narberth, LLC for which no agreement has been supplied by the parties.  In making this determination, the Court will discuss the following: (1) the effect of an integration clause on claims for fraudulent inducement and (2) the gist of the action doctrine.

### i. Legal Principles

#### 1. Integration Clause

The three agreements: (i) 428 N. 13th Partners, LLC Agreement; (ii) 429 N. 13th Partners, LLC Agreement; and (iii) 1310-12 Frankford Ave, LLC Operating Agreement contain what are known as integration clauses.  "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."  Restatement (Second) Contracts § 209(1). When a contract contains an integration clause, it "[n]ormally . . . bars a party's later claim that he was fraudulently induced to sign the contract.  A plaintiff can hardly claim to have relied on a lie about the contract if he denied having any side understandings."  Dansko Holdings, Inc. v. Benefit Trust Co., 991 F.3d 494, 500 (3d Cir. 2021) (citation omitted).  In signing an integration clause,

"a party concedes that it has not <u>yet</u> been falsely induced to sign the contract."  <u>Id.</u>  (emphasis in original).

In <u>SodexoMAGIC, LLC v. Drexel Univ.</u>, the Third Circuit had another opportunity to review integration clauses, specifically their relationship with the parol evidence rule.  24 F.4th 183, 213-16 (3d Cir. 2022).  The court noted that "[o]nce a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible <u>to explain or vary the terms of the contract</u>."  <u>Id.</u> at 213 (emphasis in original) (citation omitted).  However, the court stated that the parol evidence rule may function differently when a plaintiff brings a claim for fraudulent inducement.  <u>See id.</u> at 213-14.  Specifically, "for fraudulent inducement claims, the purpose of extrinsic evidence is to prove a precontractual misrepresentation or concealment – not to alter or vary the terms of the contract. . . .  Thus, the parol evidence rule <u>acting alone</u> does not prevent fraudulent inducement claims arising out of integrated contracts." <u>Id.</u> at 213 (emphasis in original) (citations omitted).  Importantly, the court also addressed the concept of a "fraud-insulating term," which alters the analysis of a fraudulent misrepresentation claim.  <u>Id.</u> at 213-14. A fraud-insulating term is one which typically "prevent[s] a party from satisfying the justifiable-reliance element of a fraudulent inducement claim."  <u>Id.</u>  at 214.  Such a term may take the form of "a no-reliance clause, through which a party expressly disclaims reliance on another party's precontractual representations."  <u>Id.</u> (citations omitted).  It may also "state that the representations in the contract either supersede all prior representations or are the only representations made."  <u>Id.</u> (citations omitted).  The effect of such a provision is to "extend[] the reach of the parol evidence rule.  In that circumstance, the parol evidence rule prevents the use of

extrinsic evidence to vary the fraud-insulating term.  And without such evidence, it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." Id.

### 2.   Gist of the Action Doctrine

The gist of the action doctrine, as its name implies, tasks a court to decide whether the factual foundation of a plaintiff's allegations sound in contract or in tort.  Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014).

The gist of the action doctrine has a storied history, particularly as to whether claims for fraudulent inducement, which Plaintiff presently alleges, are barred under it.  See id. at 60-70 (discussing case law history starting in 1830 to the present).  Further complicating the gist of the action doctrine analysis is whether a claim for fraudulent inducement or for fraudulent performance is brought.  See generally Vives v. Rodriguez, 849 F. Supp. 2d 507, 518 (E.D. Pa. 2012).  Specifically, claims for fraudulent inducement were historically deemed tangential to a contractual claim, whereas fraudulent performance claims were considered to be embedded within a contractual claim.  Id. ("the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties.  If so, then the alleged fraud is generally held to be merely collateral to a contract . . . .  If not, then the gist of the action would be fraud . . . .") (internal quotation marks omitted) (citing eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. 2002)).[46]  As such, claims for fraudulent inducement could proceed, as they were not

---

[46]   But see Vives v. Rodriguez, 849 F. Supp. 2d 507, 519 (E.D. Pa. 2012).

"[T]he particular theory of fraud – whether it lies in inducement or performance - is not dispositive" . . . "the test to be applied to claims of fraud in the inducement . . . is whether actions lie from a breach of the duties imposed as a matter of social policy or from the breach of duties imposed by mutual consensus pursuant to contract."

(citations omitted).

considered to fall under the ambit of the gist of the action doctrine.  Here, Plaintiff only relies on fraudulent inducement.

In <u>Bruno</u>, the Pennsylvania Supreme Court officially adopted the gist of the action doctrine and stated:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—<u>i.e.</u>, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. . . .  If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

<u>Id.</u> at 68 (citations omitted); <u>see also</u> <u>Dansko Holdings, Inc.</u>, 991 F.3d at 501 (stating that "a plaintiff cannot say that a defendant defrauded him just by reneging on a contractual promise" and that therefore, when a defendant's misrepresentation deals not with the "contents" of the parties' agreement, but instead with a "side issue," the defendant does not breach the agreement, but rather potentially breaches "a social duty not to lie to business partners") (citing <u>Bruno</u>, 106 A.3d at 68).

Later, in <u>Ohama v. Markowitz</u>, a District Court addressed the ongoing debate over fraudulent inducement claims post-<u>Bruno</u>:

> In the wake of <u>Bruno</u>'s confirmation that Pennsylvania adheres to the gist of the action doctrine, courts are split on whether the doctrine subsumes a claim that a defendant intentionally misrepresented its intent to perform under the contract; that is, a claim of fraudulent inducement. . . .  Although there is not consensus, the majority view rejects fraudulent inducement claims as inconsistent with the gist of the action doctrine.  <u>Compare</u> <u>Wen v. Willis</u>, 117 F. Supp. 3d 673, 682 n.2 (E.D. Pa. 2015) (Beetlestone, J.) ("The decision in <u>Bruno</u>, though it speaks in broad terms of looking to 'the nature of the duty alleged to have been breached,' does not alter [the rule] that fraud in the inducement claims arising from the misrepresentation of an intention to perform under a contract are barred under the gist of the action doctrine."), <u>Malone</u>, 2018 WL 827433, at *5 ("Permitting a fraudulent inducement claim in this case would essentially negate . . . the gist of the action doctrine."), <u>Glob. Sourcing LLC v. DBDK Int'l, LLC</u>, No. 17-325, 2018 WL 723098, at *2 (E.D. Pa. Feb. 5, 2018) (Beetlestone, J.) (concluding that "representations concerning the [d]efendants' intent to perform, including their intent to pay in the

future, are subsumed by a claim for breach of contract [because] any claim premised on that contention is barred by the gist of the action doctrine."), and Precision Indus. Equip. v. IPC Eagle, No. 14-3222, 2016 WL 192601, at *6 (E.D Pa. Jan. 14, 2016) (O'Neill, J.) (rejecting fraud claim because "the promise that defendant made to induce plaintiff to enter into a contract is the same promise that plaintiff claims defendant broke as term of that contract"), with Techinomics, Inc. v. Forest Power & Energy Holding, Inc., No. 2:16-1859, 2017 WL 2536969, at *3 (W.D. Pa. May 11, 2017) ("[T]he gist of the action doctrine should not be viewed as a bar to . . . [claims] for fraudulent inducement and negligent misrepresentation."), and KMB Shamrock, Inc. v. LNR Transp., Inc., No. 09 CV 9046, 2015 WL 13779752, at *7 (Pa. Commw. Ct. Sept. 25, 2015) ("[F]raudulent inducement claims should remain unaffected by the gist of the action doctrine following . . . Bruno.")

434 F. Supp. 3d 303, 319-20 (E.D. Pa. 2020).

In the wake of Bruno, therefore, courts have found that fraud in the inducement claims are barred by the gist of the action doctrine, as they often present a contractual dispute.  See e.g., Ohama, 434 F. Supp. 3d at 318-20; C.J. Hughes Construction Co., Inc. v. v. EQM Gathering OPCO, LLC, Civil Action No. 2:18-cv-168, 2020 WL 3448383, at *11 (W.D. Pa. June 24, 2020).

For example, in Wen v. Willis, the Eastern District of Pennsylvania held that the gist of the action doctrine bars fraudulent inducement claims.  117 F. Supp. 3d 673, 681, 683 (E.D. Pa. 2015). In Wen, the defendants, in return for a $4 million investment from the plaintiff, promised that "they would manage that investment for his benefit, deliver a return on the investment, and guarantee the $4 million principal would be returned in full when the investment concluded."  Id. at 677-78.  Wen agreed to the deal and after the defendants created two LLCs, FFE and Foxcode Capital, to facilitate the transaction, Wen signed an LLC Agreement.  Id. at 678.  Under this LLC Agreement, the plaintiff would receive "a 99.99% membership interest in FFE, and Foxcode Capital would contribute $4000 for a .01% membership interest while providing 'all finance advis[ory] services necessary to generate earnings for [FFE].'"  Id.  In accordance with the LLC Agreement, Wen paid the $4 million investment.  Id.  However, Wen alleged that "the Defendants

drained the money out of FFE's bank account, transferring nearly all of it into their own accounts." Id. at 679.

Wen asserted claims for fraud and fraud in the inducement.  Id.  The defendants argued that Wen was precluded from bringing such claims because of the gist of the action doctrine.  Id. at 680-81.  Specifically, the defendants argued that "any representations they made . . . are expressly covered by the FFE agreement . . . ."  Id. at 680.

Wen attempted to rely on the distinction between fraudulent inducement and fraudulent performance, arguing that his claim fell under the first category and therefore was not a matter of contract.  Id. at 681.  The court, while not disagreeing, emphasized that:

> it is equally the case . . . that "[w]here the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred by the gist of the action doctrine."

Id. (citing Integrated Waste Sol'ns, Inc. v. Goverdhanam, No. 10-2155, 2010 WL 4910176, at *11 (E.D. Pa. Nov. 30, 2010)).

The court then compared Wen's original allegations with the terms of the contract.  Wen, 117 F. Supp. 3d at 682.  In the Complaint, Wen alleged:

> To induce Wen [to] execute the Foxcode Far East LLC Agreement and to place the $4 million investment with Willis and Foxcode, through Foxcode Far East, Willis on behalf of himself and Foxcode represented to Wen that, if he did so, they would . . . manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded.  The representation that Willis and Foxcode would manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded was further confirmed in the Foxcode Far East LLC Agreement.

Id. (omission in original).

The LLC Agreement stated:

> (1) Foxcode Capital Markets would "provide cash and all finance advis[ory] services necessary to generate earnings for Foxcode Far East LLC," . . . ; (2) Wen would receive 99.99% of the Net Profits of the Company . . . ; [and] (3) when FFE was dissolved, Wen was guaranteed that Foxcode Capital would provide for the return of an amount sufficient to make the total distributions to Wen equal to $4 million . . . .

Id. at 682-83.

The court therefore concluded that the alleged misrepresentations were "incorporated into the FFE agreement." Id. at 683. As such, the court held that the fraud claims could not proceed, as the gist of the action doctrine barred them. Id.

However, the court in SodexoMAGIC provided additional clarification on the gist of the action doctrine:

> The gist of the action doctrine does not apply here because SDM's fraudulent inducement claim does not depend on the breach of a contractual duty. SDM alleges that Drexel misrepresented and intentionally concealed its internal student enrollment projections while the parties were negotiating the Management Agreement. At that time, however, the parties had not executed the Management Agreement. And without a binding contract, any duty Drexel owed SDM during negotiations was grounded only in tort.

24 F.4th at 217.

ii. 428 N. 13th Partners, LLC and 429 N. 13th Partners, LLC

Here, Plaintiff's wire fraud allegations as to the 428 N. 13th and 429 N. 13th Street transaction sound in contract, not tort, and in view of their integration clauses, do not qualify as predicate offenses that are acts of racketeering activity.

Proposed racketeering activities 1, 2, and 4, quoted supra, are the only ones that pertain to the 428 and 429 N. 13th Street transaction. Again, those activities are: (1) "inducing Gordon to purchase and/or take on debt;" (2) "inducing Gordon to purchase ownership in limited liability companies;" and (4) "inducing Gordon to make loans and advances." (Doc. No. 2 ¶ 78.)

Specifically, Plaintiff notes in the RICO Case Statement that "[h]e was fraudulently induced to invest money as outlined above and to pay expenses, and to personally guarantee mortgages." (Doc. No. 20 ¶ 3(a).)

Plaintiff may not rely upon Defendants' prior representations for these two properties. Plaintiff and Pasquarello signed two LLC Agreements, one for 428 N. 13th Street and one for 429 N. 13th Street.  (See id. ¶ 29; Doc. Nos. 7-4; 7-5.)  Both LLC Agreements contain an integration clause.  (See Doc. Nos. 7-4, 7-5 at 22.)  The clause states:

> This Agreement constitutes the complete and exclusive statement of the agreement among the Members.  It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.  This Agreement may not be amended without the written consent of Members holding at least fifty-one percent (51%) of the issued and outstanding Units.

(Id.)

The LLC Agreements not only include this integration clause, but also a "fraud-insulating provision," as the LLC Agreements state that each "supersedes all prior written and oral statements, including any prior representation."  (Id.)  As stated in SodexoMAGIC, an integration clause that incorporates a fraud-insulating provision "prevents the use of extrinsic evidence to vary the fraud-insulating term. And without such evidence, it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim."  SodexoMAGIC, 24 F.4th at 214. Accordingly, Plaintiff may not assert a claim for fraudulent inducement based upon the oral representations Defendants allegedly made.  Instead, he is bound by the terms of the LLC Agreements.

Because the inclusion of an integration clause with a fraud-insulation provision is sufficient to preclude Plaintiff's claims of fraudulent misrepresentation, the gist of the action doctrine need not be discussed.  Plaintiff is unable to establish that Defendants engaged in fraudulent conduct

regarding the 428 N. 13th Street and 429 N. 13th Street transaction.  Correspondingly, the alleged misrepresentations made before this transaction are not a recognizable fraud predicate offense under the RICO statute.

### iii.    Defendant 1310-12 Frankford Ave, LLC

The proposed predicate acts pertaining to the 1310-12 Frankford Ave, LLC transaction are numbers 2, 3, and 4, supra.  Again, those acts are: (2) "inducing Gordon to purchase ownership in limited liability companies;" (3) "defrauding Gordon by stealing from him the monies to which he was entitled as owner of the Class A units of 1310-12 Frankford;" and (4) "inducing Gordon to make loans and advances."  (Doc. No. 2 ¶ 78.)  The relevant alleged fraudulent representations were: (i) Pasquarello's knowledge of the market; (ii) Pasquarello's ability to secure properties at a below market price; (iii) the leases' abilities to heighten the value of the properties; (iv) the properties being sold or refinanced expeditiously; (v) Plaintiff's advances being paid through the properties' rent payments; (vi) the full return of Plaintiff's investment; (vii) the 8% interest on Plaintiff's investments; (viii) Plaintiff's potential receipt of his share of any excess profits; and (ix) Pasquarello's promise to pay a share of the property's costs.  (Id. ¶¶ 17-18.)

Plaintiff and Pasquarello were joint members of 1310-12 Frankford Ave, LLC, which was governed by an Operating Agreement that contained an integration clause.  The integration clause states: "[t]his Agreement represents the entire limited liability company agreement of the Company within the meaning of the Act."  (Doc. No. 7-6 at 7.)  However, this integration clause differs from the ones in the 428 N. 13th and 429 N. 13th LLC Agreements, because it does not reference the parties' earlier representations.  Furthermore, the integration clause was agreed to in 2013 between Mackey and Pasquarello.  Accordingly, the integration clause found in the Operating Agreement does not bar consideration of the prior representations made by Defendants and

therefore does not initially preclude a claim of fraudulent inducement.  But for reasons that follow, Plaintiff's claims still fail.

First, proposed predicate acts 2 and 4 will be analyzed jointly.

Plaintiff states that the first predicate act of fraud caused him "to purchase ownership in limited liability companies."  (Doc. No. 2 ¶ 78.)  He then asserts that he also was fraudulently induced "to make loans and advances."  (Id.)  Here, the fraudulent misrepresentations that allegedly led to Plaintiff purchasing ownership in 1310-12 Frankford Ave, LLC, and the corresponding benefits that this ownership was meant to bestow, directly relate to the Operating Agreement and its terms.  However, the Third Circuit's opinion in SodexoMAGIC must be addressed.  There, the court held that while allegations of misrepresentation[47] and intentional concealment were made, because the contract had not yet been created between the parties, "any duty . . . owed . . . during negotiations was grounded only in tort."  SodexoMAGIC, 24 F.4th at 217.  Here, the timeline of the transaction is unclear.  As noted previously, the attached Operating Agreement is between Mackey and Pasquarello, not between Gordon and Pasquarello.  The Court is therefore unaware of whether Plaintiff and Pasquarello re-executed the Operating Agreement.  As such, it is difficult to apply SodexoMAGIC, because in the purchase by Plaintiff of Mackey's estate's shares, the Operating Agreement was already in existence, rather than not yet being created

---

[47]  It is again worth noting that Plaintiff alleges that the same misrepresentations were made before the 501 N. 13th, 428 and 429 N. 13th, and 1310-12 Frankford Ave, LLC transactions.  Interestingly, it appears that Plaintiff only frames the misrepresentations for the latter transactions as fraudulent.  While his first proposed act of racketeering activity, "inducing Gordon to purchase and/or take on debt for the purchase of properties" (Doc. No. 2 ¶ 78) encompasses allegations made in the 501 N. 13th transaction, in the Response to the Motion to Dismiss, he states: "[a]part from the first acquisition of the Prohibition Taproom restaurant property by which Michael and Jeniphur Pasquarello convinced Jason Gordon of their good faith, all those promises were false when made."  (Doc. No. 11 at 14.)  How the same misrepresentations may be fraudulent as to certain transactions and not fraudulent as to another is unclear.

by the parties.  Considering the alleged misrepresentations here as occurring before the creation of a binding contract, <u>SodexoMAGIC</u> would presumably permit Plaintiff's first two proposed predicate acts to proceed because they are not barred by the gist of the action doctrine.[48]

Although the gist of the action doctrine would not bar the first two proposed predicate acts, "inducing Gordon to purchase ownership in limited liability companies" and "inducing Gordon to make loans and advances," (Doc. No. 2 ¶ 78), these predicate acts still do not make out a pattern of racketeering activity.  While only two acts are required under Section 1962(c), two additional elements must be met to establish a pattern of racketeering activity: (1) relatedness and (2) continuity.  <u>See</u> <u>Bergrin</u>, 650 F.3d at 267 (citation omitted).  Plaintiff's allegations fail to meet the latter.  Specifically,

> [the Third Circuit] has observed that in cases where the object of the fraudulent activity is a "single piece of real estate," or an attempt "to force a single business entity bankrupt," is "directed at a single entity," or can generally be characterized as a "single-scheme, single-victim" transaction, there is no "pattern" of racketeering activity.

<u>Stoss</u>, 2010 WL 678115, at *7 (citations omitted).  Consequently, construing the two 1310-12 Frankford Ave, LLC predicate acts as the only viable offenses, the "object of fraudulent activity . . . is 'directed at a single entity.'"  <u>Id.</u>  As such, while two predicate acts are alleged, the continuity element fails, and therefore so too does the pattern of racketeering activity.

As to the third predicate act, Plaintiff describes Defendants as: "defrauding Gordon by stealing from him the monies to which he was entitled as owner of the Class A units of 1310-12 Frankford limited liability company."  (Doc. No. 2 ¶ 78.)  This conduct is contractual in nature, a

---

[48]  As noted previously, under Federal Rule of Civil Procedure 9(b), fraud must be pled with specificity.  Viewing the facts in a light most favorable to Plaintiff, this heightened pleading standard is met in regard to these acts.

fact that Plaintiff himself appears to acknowledge in the Complaint and in his RICO Case Statement.  In the Complaint, he alleges:

> As <u>Manager</u> [of the LLC], Michael Pasquarello ignored the <u>LLC's obligation</u> to pay Gordon the preferred dividend to Gordon . . . .  Michael Pasquarello concealed from Gordon his <u>obligation</u> to make the preferential payments . . . .  In addition, as the owner of Class A shares, Gordon was <u>entitled</u> to an allocation of losses corresponding to his investment.  As <u>Manager</u>, Michael Pasquarello never allocated the losses <u>pursuant to the LLC agreement</u>, which required virtually all of the losses be allocated to Gordon. . . .  Michael Pasquarello further defrauded Gordon by allocating half of the losses of the company (there were never any profits) to each of Michael Pasquarello and Gordon.  But the <u>Operating Agreement</u> required virtually all of the losses (and any profits) to be distributed to Gordon as the owner of all the Class A units and none to Michael Pasquarello.[49]

(<u>Id.</u> ¶¶ 50-51, 53-54, 59) (emphasis added).

---

[49] Plaintiff repeats this alleged wrongdoing and harm in subsequent counts of the Complaint. First, in Count II (Shareholder Oppression and Appointment of a Custodian Under 15 Pa. Con. Stat. Ann. § 1767), he states: "Michael Pasquarello misused and abused his position as Manager of 1310-12 Frankford [Ave, LLC] to oppress Gordon and deprive him of his reasonable expectations as owner of 100% of the Class A units."  (Doc. No. 2 ¶ 88.)  Next, in the same count, he alleges: "Michael Pasquarello further abused his unfettered control of 1310-12 Frankford for his own benefit and that of Jenniphur [sic] Pasquarello to Gordon's detriment by allocating 50% of the losses to himself. . . ."  (<u>Id.</u> ¶ 90.)  Then, in Count III (Breach of Fiduciary Duty), he contends: "[h]e [Michael Pasquarello] could not, as he did here, act to the detriment of Gordon to exclude him from his proper share of the benefits otherwise due him as the owner of all the Class A shares . . . ."  (<u>Id.</u> ¶ 95.)  In Count IV of the Complaint (Breach of the Operating Agreement for 1310-12 Frankford), Plaintiff alleges: "[t]he defendants breached the <u>Operating Agreement</u> by failing (a) to allocate the profits and losses of the Company and (b) make the payments to Gordon as the owner of the Class A Ownership units, <u>all as required by the Operating Agreement</u>."  (<u>Id.</u> ¶ 102) (emphasis added).  Lastly, in Count V (Breach of Contract), he states: "[a]s alleged above, Gordon and Michael Pasquarello entered into a number of contracts relating to . . . the purchase of the Class A units. . . .  As alleged above, Michael Pasquarello breached and/or repudiated each of the contracts . . . ."  (<u>Id.</u> 105-06.)

Therefore, what Plaintiff frames as "defrauding [him] by stealing from him the monies to which he was entitled as owner of the Class A units" appears to serve as the foundation for claims of shareholder oppression, breach of fiduciary duty, and breach of contract.  As such, this alleged predicate act is not the type of fraudulent conduct the RICO statute is aimed to protect against, but instead is merely a matter of contract law.

Then, in the RICO Case Statement, he writes: "[i]n addition to and separate from the promises that Michael and Jenniphur [sic] Pasquarello made to induce the investment, Jason Gordon acquired rights to benefits as the owner of Class A shares pursuant to the operating agreement: return of investment, 4.25% interest, and virtually all profits and losses."  (Doc. No. 20 ¶ 1) (emphasis added).)  Also, in the Complaint, Plaintiff states: "[t]he owner of the Class A shares, however, was entitled to receive preferred payments and allocations of profits and losses as specified in the Operating Agreement . . . ."  (Doc. No. 2 ¶ 42) (emphasis added).  Therefore, Plaintiff seemingly acknowledges that the benefits derive exclusively from the Operating Agreement, and as such are contractual harms.

Furthermore, the Operating Agreement directly addresses the preferred return as well as the distribution of profits and losses.

Specifically, as to the 4.25% interest, it states:

4.4(a) Preferred Return.  Holders of Class A Preferred Interests shall be entitled to receive, out of funds legally available therefor[e], and the Company shall pay, a sum equal to four and one-quarter percent (4.25%) per annum (the "Class A Preferred Return") (determined on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, for the actual number of days in the period for which such Preferred Return is being determined) on any outstanding capital contribution made by such holder of Class Preferred Interests (the "Unreturned Capital Balance") which relates to such Class A Preferred Interests, commencing on the date such Class A Preferred Interest were issued (the "Original Issue Date"). . . .

(Doc. No. 7-6 at 4.)

Then, as to the distribution of profits and losses, the Operating Agreement notes:

5.1 Allocation of Profits and Losses.  For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Schedule A, as amended from time to time, in accordance with Treasury Regulation 1.704-1.

> 5.2 Distributions.  Subject to 4.4(c), distributions shall be made to the Members at the times and in the aggregate amounts determined by vote of the Manager.  The priority of distributions made pursuant to this Section 5.2 shall be in accordance with Section 6.3.

(Id. at 6.)

Furthermore, the facts in this case closely mirror those in Wen.  As in Wen, in which the plaintiff's alleged misrepresentations matched the provisions of the subsequent LLC Agreement and were barred under the gist of the action doctrine, Plaintiff's alleged harms, namely Defendants' failure to pay interest and properly allocate losses, also are identical to provisions found in the Operating Agreement.  Accordingly, Plaintiff's proposed predicate act of being deprived of monetary benefit[50] is a matter of contract, not fraud, and may therefore not serve as a foundation for a RICO predicate offense.

### iv.  Café Lift Narberth

Finally, proposed predicate acts number 5, 6, and 7 pertaining to the Café Lift Narberth transaction are also contractual in nature, rather than fraudulent.  Again, the relevant predicate acts are: (5) "inducing Gordon to retain defendants to manage Café Lift Narberth;" (6) "taking funds from Café Lift Narberth in the guise of management fees to which they were not entitled;" and (7)

---

[50]  See, e.g., Kolar v. Preferred Real Estate Invs., 361 F. App'x 354, 363 (3d Cir. 2010) (stating that:

> [T]he balance of the complaint sets forth no activity containing any "deceptive elements."  Rather, the essence of Kolar's complaint alleges that defendants have "diverted and/or misappropriated monies … due and payable" to him under purported claims of contractual right.  For instance, the defendants allegedly diverted funds from Kolar, claiming that he owed capital-call obligations in connection with his interests in other Affiliates.  Kolar attempts to characterize these contract-based claims of right as "false" and "fraudulent," but we are unpersuaded.)

(citations omitted).

"using funds to which they were not entitled to purchase assets including a vacation home in Ventnor, New Jersey."[51]  (Doc. No. 2 ¶ 78.)

In contrast to the two acts which can be construed as fraudulent, the representations preceding the Café Lift Narberth venture included the Pasquarellos' promises to "(a) repay the Opening Expenses; (b) pay the rent, utilities and other expenses under the triple net lease then in effect; and (c) cover their management fees."[52]  (Id. ¶ 65.)  And in Wen, the court stated:

> [W]here the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred by the gist of the action doctrine.

Wen, 117 F. Supp. 3d at 681 (citation omitted).  Accordingly, their "specific duties" would be to manage the company so as to: (1) repay 30% of the Opening Expenses; (2) pay their share of the operating expenses; and (3) "take management fees only from profits."  (See Doc. No. 2 ¶¶ 61, 65; Doc. No. 20 ¶1.)

Again, SodexoMAGIC must be considered.  The facts regarding Café Lift Narberth differ from those in SodexoMAGIC.  Here, the parties do not attach to their filings an LLC Agreement, an Operating Agreement, or a Management Agreement.  At the hearing on the Motion to Dismiss, the parties stated that there was no written agreement for this transaction.[53]  However, there was at least an oral contract here.  In Count VII of the Complaint (Breach of the Management Agreement), Plaintiff alleges that there was such an agreement by stating the following:

---

[51]  The focus of act 7 is on the use of funds "to which they were not entitled" rather than on the purchase of a vacation home in Ventnor, New Jersey.  Whether the Pasquarellos were entitled to the funds would depend on the terms of the contract.

[52]  In his RICO Case Statement, Plaintiff states more specifically that the couple would "take management fees only from profits."  (Doc. No. 20 ¶1.)

[53]  See n. 12, supra.

> As alleged above, the parties entered into an agreement for the defendants to operate Café Lift Narberth.  The defendants breached the terms of that agreement, wrongfully took over $110,000 in fees to which they were not entitled and failed to pay plaintiff the rent, other expenses, and the Opening Expenses to which he was entitled.

(Doc. No. 2 ¶¶ 113-14.)

Then, in his Response to the Motion to Dismiss, Plaintiff states that this Count alleges "that both Michael and Jeniphur breached their oral contract to manage the Café Lift Narberth restaurant."  (Doc. No. 11 at 8.)

SodexoMAGIC focused on "misrepresentations" occurring during the negotiation process, when those misrepresentations were made without "a binding contract."  However, here, predicate acts 5, 6, and 7 and the terms of the oral contract are one and the same.  Specifically, the alleged misrepresentations were to manage the company so as to: (1) repay 30% of the Opening Expenses; (2) pay their share of the operating expenses; and (3) "take management fees only from profits."  (Doc. No. 2 ¶¶ 61, 65; Doc. No. 20 ¶ 1.)   In Count VII, Plaintiff effectively repeats these misrepresentations in stating that Defendants: (i) breached the terms of that agreement; (ii) failed to pay . . . the Opening Expenses; (iii) "failed to pay plaintiff the rent [and] other expenses"; and (iv) "wrongfully took over $110,000 in fees to which they were not entitled."  (Doc. No. 2 ¶¶ 113-14.)

Furthermore, in the Complaint, Plaintiff writes: "[t]he consideration for Michael Pasquarello's ownership in CLN was his agreement to be personally responsible for repayment of 30% of the . . . opening expenses and to pay his proportionate share of the operating expenses."  (Id. ¶ 61) (emphasis added).  Whether a contract is an oral one or a written one, a contract is formed when there is "(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration."  Salvitti v. Lascelles, 578 F. Supp. 3d 712, 721 (E.D. Pa.

2022) (emphasis added) (citation omitted).  By employing the term "consideration," Plaintiff is pursuing a contractual cause of action.

Accordingly, the proposed predicate acts of inducing Plaintiff to retain the Pasquarellos to manage Café Lift Narberth, their taking of funds from Café Lift Narberth, and using funds to which they were not entitled, sound in contract, not fraud, and are barred by the gist of the action doctrine

In sum, because each of the alleged fraudulent misrepresentations as described above regarding each property are barred by an integration clause, by the gist of the action doctrine, or for a lack of continuity, Plaintiff's attempts at pleading cognizable RICO predicate acts are unsuccessful.

Additionally, Plaintiff has not shown that Defendants 1310-12 Frankford Ave, LLC and HRCP participated in a pattern of racketeering activity.  Section 1961(5) defines a pattern of racketeering as requiring a defendant to commit at least two predicate offenses.  18 U.S.C. § 1961(5).  Here, Plaintiff alleges that Defendants 1310-12 Frankford Ave, LLC and HRCP were only involved in the 1310-12 Frankford Ave, LLC transaction.  Plaintiff does not allege that they played a role in any of the other three transactions.  Accordingly, 1310-12 Frankford Ave, LLC and HRCP did not engage in a pattern of racketeering activity.

### 3.  Standing Under RICO

While Plaintiff's inability to plead sufficient facts in support of an enterprise and a pattern of racketeering activity are fatal to his claim, the Court will briefly analyze whether Plaintiff has standing under RICO.

In his Complaint, Plaintiff asserts that he "is a 'person injured in his or her business or property by reason of a violation of' RICO within the meaning of 18 U.S.C. § 1964(c)."  (Doc.

No. 2 ¶ 74.)  Defendants[54] contend that Plaintiff lacks standing to bring a RICO claim.  (See Doc. No. 7-3 at 11-13.)  They argue that because Plaintiff suffered no injury independent of the various LLCs or properties, he is precluded from bringing this claim.  (See id. at 11-13.)  During the hearing on the Motion to Dismiss, Defendants stated that they are challenging standing solely on the 1310-12 Frankford Ave, LLC transaction.  Oral Argument at 20:30-20:57; 21:19-21:25.

To bring a claim under RICO, one must have standing.  See 18 U.S.C. § 1964.  18 U.S.C. § 1964(c) provides in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor[e] in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(c).

The above language boils down to two elements that a plaintiff must prove.  "First, . . . that he or she suffered an injury to his 'business or property.'  Second . . . that his injury was proximately caused by the defendants' § 1962 RICO violation."  Jannuzzio v. Danby, Civil Action No. 22-cv-1189, 2022 WL 2541678, at *8 (E.D. Pa. July 7, 2022) (citation omitted).

### a.   Injury to Business or Property

The relevant RICO injury must be "concrete."  Id. at *9 (citation omitted).  This "can be satisfied by allegations and proof of actual monetary loss" or "a present economic loss."  Id. (emphasis in original) (internal quotation marks omitted).

### b.   Proximate Cause

Not only must one allege injury to business or property, but one also must demonstrate proximate cause.  Id. at *8-9.  Proximate cause requires a court to "ask . . . whether the alleged

---

[54]   Again, Defendants in this case are: (1) Michael Pasquarello; (2) Jeniphur Pasquarello; (3) 1310-Frankford Ave, LLC; and (4) HRCP.

violation led directly to the plaintiff's injuries." Id. at *9 (citation omitted).  This injury must be "proximately caused by the defendants' § 1962 RICO violation."  Id. at *8 (emphasis added) (citation omitted); see also Gratz, 822 F. App'x at 81 ("[A] plaintiff [must] . . . demonstrate 'that . . . she was injured by an act that is independently wrongful under RICO, … and not merely by a non-racketeering act in furtherance of a broader RICO conspiracy.'") (citation omitted); Kenney v. Am. Bd. of Internal Med., 847 F. App'x 137, 146 (3d Cir. 2021).

Further, in deciding on proximate cause, a court is to consider the following: "(1) the directness of the injury; (2) the ease of apportioning damages among other plaintiffs affected by the alleged violation; and (3) the possibility that others, more directly injured, could vindicate the claim." Jannuzzio, 2022 WL 2541678, at *9 (citation omitted).  Recently, the Third Circuit held that proximate cause under RICO involves consideration of six factors, which are:

> (1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury . . . ; (4) the directness or indirectness of the asserted injury; (5) whether the damages claim is . . . highly speculative; and (6) keeping the scope of complex . . . trials within judicially manageable limits, i.e., avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

Gratz, 822 F. App'x at 81 (citing Anderson v. Ayling, 396 F.3d 265, 270 (3d Cir. 2005)).

### 4.   Plaintiff Has Not Pled Proximate Cause

In pleading proximate cause, one must show that the injury was from "the defendants' § 1962 RICO violation."  Jannuzzio, 2022 WL 2541678, at *8.  Plaintiff's allegations fail to create standing because, as analyzed above, he is unable to sufficiently plead that there was an enterprise or a pattern of racketeering activity.  In failing to meet these two elements of a Section 1962(c) claim, Plaintiff does not plausibly allege a RICO violation.  And for this reason, he has no standing because there is no causal connection between a violation of Section 1962(c) and Plaintiff's harm.

64

He has suffered no direct injury from a RICO violation.  In light of these critical impediments, there is no need to discuss the remaining factors.

### B.  Motion to Dismiss Standard under Federal Rule of Civil Procedure (12)(b)(1) for Lack of Subject Matter Jurisdiction

Defendants assert that because Plaintiff has failed to meet each of the requisite elements of a RICO claim, the entire case must be dismissed for lack of subject matter jurisdiction. Specifically, they argue that Plaintiff's remaining claims arise under state law and these claims should be dismissed because diversity of citizenship jurisdiction does not exist between the parties. (Doc. No. 7-3 at 17-18.)  Plaintiff alleges that this case is properly brought before the Court under 28 U.S.C. §§ 1331 and 1332.  (See Doc. No. 2 ¶ 12.)

A federal court has original jurisdiction in two circumstances: (1) federal question jurisdiction and (2) diversity of citizenship jurisdiction.  See 28 U.S.C. §§ 1331-32.  Section 1331, which grants federal question jurisdiction, states: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Section 1332, which grants diversity of citizenship jurisdiction provides, in relevant part: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States . . . ."  Id. § 1332(a)(1).  Plaintiff's allegation of a RICO violation is the only federal question presented in this matter.  This claim is being dismissed. Accordingly, the only available alternative for Plaintiff's case to remain in federal court is diversity of citizenship jurisdiction.  However, diversity of citizenship jurisdiction also does not exist in this case.

Diversity of citizenship jurisdiction has two elements: (1) complete diversity of citizenship and (2) an amount in controversy in excess of $75,000.  See Lincoln Ben. Life Co. v. AEI Life,

LLC, 800 F.3d 99, 104 (3d Cir. 2015) (citations omitted).  Complete diversity means that every plaintiff is diverse from every defendant.  See id. (citation omitted).  Plaintiff does not meet the first element.

The determination of citizenship hinges on the identity of the parties.  Here, there are three identities: (1) natural persons (Plaintiff and the Pasquarellos); (2) an LLC (1310-12 Frankford Ave, LLC); and (3) a corporation (HRCP).  In the Complaint, Plaintiff does not assert the citizenship of any of the parties, including himself.  Instead, these details arise in the RICO Case Statement.

First, "[a] natural person is deemed to be a citizen of the state where he is domiciled."  Id. (citation omitted).  Plaintiff Jason Gordon and the Pasquarellos are natural persons.  Plaintiff resides in Pennsylvania and is therefore a Pennsylvania citizen.  (Doc. No. 20 ¶ 1.)  The Pasquarellos reside in New Jersey and are therefore New Jersey citizens.  (See id.)

Second, "the citizenship of an LLC is determined by the citizenship of its members." Lincoln Ben. Life Co., 800 F.3d at 105 (internal quotation marks and citations omitted).  1310-12 Frankford Ave, LLC is a limited liability company.  (Doc. No. 2 ¶ 10.)  It is unclear, however, whether 1310-12 Frankford Ave, LLC currently has two members or one.[55]  Regardless, citizenship is determined at the time of filing the Complaint.  See Stein v. Matheson, 539 F. Supp. 3d 463, 470 (E.D. Pa. 2021) (citation omitted).  At the time of filing, 1310-12 Frankford Ave, LLC consisted of two members: Plaintiff, a Pennsylvania citizen, and Pasquarello, a New Jersey citizen. (See Doc. Nos. 2 ¶¶ 38, 48; 20 ¶ 1.)  Therefore, 1310-12 Frankford Ave, LLC is considered a citizen of Pennsylvania and New Jersey.  Because Plaintiff is also a citizen of Pennsylvania, complete diversity has not been established.

---

[55] See n. 26, supra.

Lastly, "a corporation is a citizen both of the state where it is incorporated and of the state where it has its principal place of business."  Lincoln Ben. Life Co., 800 F.3d at 104 (internal quotation marks and citation omitted).  HRCP is a Pennsylvania corporation and its principal place of business is 1310-12 Frankford Avenue, Philadelphia, Pennsylvania.  (Doc. No. 7-2 at 1.)  HRCP is therefore a citizen of Pennsylvania.  Plaintiff is also a citizen of Pennsylvania.  Accordingly, complete diversity of citizenship again is not met.  Because Plaintiff's citizenship is not diverse from the citizenship of two Defendants, the Court does not have jurisdiction over the state law claims in this case.  Accordingly, considering the dismissed RICO claim and the absence of diversity of citizenship jurisdiction regarding the state law claims, the Court lacks original jurisdiction over this case.

And even if the Court had subject matter jurisdiction over the case, the Court would not exercise supplemental jurisdiction over the state law claims.

The exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367(c), which states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -- (1) the claim raise novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exception circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Moreover, as noted in the Modern Portable Refrigeration, LLC decision:

> Pursuant to 28 U.S.C. § 1367(c)(3), a "district court may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."  A district court's decision whether to exercise jurisdiction after dismissing those claims over which it had original jurisdiction is purely discretionary.  However, the Third Circuit has stated that, where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state law claims unless considerations of judicial economy,

convenience, and fairness to the parties provide an affirmative justification for doing so.[56]

Modern Portable Refrigeration, LLC v. Temperatsure LLC, Civil Action No. 21-2423, 2021 WL 4818422, at *2 (E.D. Pa. Oct. 24, 2021) (emphasis in original) (citations omitted).

Judicial economy is not an issue in this case nor is convenience and fairness to the parties. The parties reside or do business in Pennsylvania and the Pasquarellos reside close by in New Jersey.  In terms of fairness to the parties, Plaintiff may pursue his breach of contract claim in state court. In addition, Plaintiff has previously brought claims regarding these properties in the Court of Common Pleas of Montgomery County.[57]  (Doc. Nos. 7-7, 7-8.)

"The United States Supreme Court has further advised that 'if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'"  Lewis v. Lehigh Valley Logistics, No. 5:21-cv-1753, 2021 WL 3030221, at *3 (E.D. Pa. July 19, 2021) (citation omitted); see also Carroll v. George W. Hill Corr. Facility, Civil Action No. 22-1720, 2022 WL 17539212, at *20 (E.D. Pa. Dec. 8, 2022) ("We will not exercise supplemental jurisdiction over Mr. Carroll's state law claims for intentional infliction

---

[56] See also Jannuzzio, 2022 WL 2541678, at *19 ("When all federal claims are eliminated before trial, 'the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (internal quotation marks and citation omitted).

[57] The Court may take judicial notice of these cases.  See Shepherd v. Coyle, Civil Action No. 21-1591, 2021 WL 2433854, at *2 n. 2 (E.D. Pa. June 15, 2021):

The Court takes judicial notice of the dockets of these cases pending in state court. See Fed. R. R. Civ. P. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and may take such notice "on its own . . . at any stage of the proceeding."); see also Pennsylvania v. Brown, 373 F.2d 771, 778 (3d Cir. 1967) ("a federal court may take judicial notice of matters of record in state courts within its jurisdiction.").

of emotional distress and gross negligence because we dismissed all claims over which we have original jurisdiction. We dismiss Mr. Carroll's state law claims as we decline to exercise supplemental jurisdiction over them.") (citation omitted); <u>Round v. City of Phila.</u>, Civil Action No. 19-3513, 2020 WL 2098089, at *12 (E.D. Pa. May 1, 2020) ("Since the Court will dismiss Plaintiffs' federal claims against Ross, it will decline to extend jurisdiction over Plaintiffs' supplemental state law claims against him under § 1367(c)(3). Consequently, Plaintiffs' state law claims against Ross will be dismissed.")

Here, the Court has dismissed the federal claim in this action pursuant to 28 U.S.C. § 1367(c)(3). In doing so, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. As this district has held, in declining to exercise supplemental jurisdiction, the Court may properly dismiss any state claims brought in tandem with the federal question cause of action.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) will be granted. An appropriate order follows.[58]

---

[58]   In his Response to the Motion to Dismiss and during the hearing on the Motion to Dismiss, Plaintiff requested leave to amend. (Doc. No. 11 at 25; Oral Argument at 55:55-56:06, 1:00:09.) Under Federal Rule of Civil Procedure 15(a), courts are to "freely give leave [to amend pleadings] when justice so requires." <u>Kern v. Phoenixville Hospital, LLC</u>, 342 F.R.D. 324, 327 (E.D. Pa. 2022) (alteration in original) (internal quotation marks omitted) (citing Fed. R. Civ. P. 15(a)(2)). But a court also has the discretion to "deny this request if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." <u>Id.</u> (internal quotation marks omitted) (citing <u>Lake v. Arnold</u>, 232 F.3d 360, 373 (3d Cir. 2000)).

In this case, it would be futile to grant Plaintiff leave to amend his Complaint for the following reasons. First, Count I, the alleged RICO violation, is being dismissed. After a hearing on the Motion to Dismiss, Plaintiff was given the opportunity to file a RICO Case Statement and answer questions about the elements of his RICO claim, which can be considered on a Motion

---

to Dismiss.  However, despite this second opportunity to clarify his claims, Plaintiff still failed
to plead a sufficient RICO violation.

Specifically, Plaintiff is unable to establish the enterprise element.  Despite the Court raising
concerns at the hearing as to how this element was plead, Plaintiff's subsequent RICO Case
Statement did not resolve the deficiencies noted by the Court.  Next, he has not proven that
there was a pattern of racketeering activity.  Specifically, his proposed predicate acts of wire
fraud are barred by an integration clause, the gist of the action doctrine, and a failure to satisfy
the continuity prong.  Furthermore, 1310-12 Frankford Ave, LLC and HRCP only participated
in one alleged predicate offense.  Section 1962(c) requires that a defendant commit at least two
offenses.  Lastly, for the reasons noted previously, Plaintiff lacks standing, a requirement under
RICO.  Because Plaintiff is unable to establish a RICO violation, any injury pled by Plaintiff
is not one proximately caused by a RICO violation.